**Upon the Petition of Karin A. HOBSON, Appellee,**

**and concerning Lauren A. HOBSON, Appellant.**

**No. 3–59410.**

Supreme Court of Iowa.

Dec. 15, 1976.

Frank S. Mitvalsky, of Silliman, Gray & Stapleton, Cedar Rapids, for appellant.

Robert W. Matias, Cedar Rapids, for appellee.

Heard by MOORE, C. J., and RAWLINGS, REES, REYNOLDSON and HARRIS, JJ.

REYNOLDSON, Justice.

This appeal, arising out of a hearing to modify a dissolution decree, concerns two children who have been removed to West Germany by their mother.

Respondent Lauren A. Hobson met the petitioner Karin A. Hobson while in military service in Berlin. They were married in Germany October 26, 1962. Two sons, Mark and Monty, were born of this marriage. Mark is now approximately eight and one-half years old. Monty is seven years of age.

From about 1967 or 1968 to 1974 Lauren and Karin lived together in Cedar Rapids. Lauren was employed by Chicago & North

Western Transportation Company. August 20, 1974, Karin filed for dissolution.

In what Lauren characterized as a "very friendly divorce" he executed, without benefit of counsel, a stipulation granting Karin custody of their sons, a 1973 auto, most of the household furniture, their homestead in which they had at least a $16,000 equity, and child support of $100 per month per child. He agreed to maintain current life insurance policies with Karin and the children as beneficiaries, obtain hospitalization insurance for the children's benefit, and pay one-half of all their medical and dental bills. The stipulation further required Lauren to pay Karin's attorney fees and the court costs.

Under this stipulation Lauren received a small share of the household goods and a 1969 auto encumbered by a lien he was required to assume. He obtained liberal visitation privileges with his sons, including a summertime "four week period of temporary custody" during which he was not required to pay child support.

The dissolution decree dated November 22, 1974 incorporated the parties' stipulation. Karin and the boys continued to reside in the homestead. The first weekend in September 1975, Lauren attempted to call Karin's telephone number to make arrangements for visitation with his sons. Upon being informed the telephone had been disconnected he called the "friend of the court" who gave him the forwarding address left by Karin, her mother's residence in West Germany. Karin had sold her household goods and the homestead, collected the money, and moved away August 31, 1975.

Lauren stopped paying his child support to the clerk of court and thereafter deposited these funds in a special savings account in Guaranty Bank. December 11, 1975, he filed an application for modification of the dissolution decree. Alleging a change in circumstances, he prayed for custody of the boys and termination of child support. In the alternative, Lauren sought modification of visitation and support provisions.

Karin, appearing by counsel, filed a resistance generally denying the allegations of the application. February 24, 1976, after hearing at which no evidence was introduced in resistance to the application, trial court denied all relief sought. Lauren filed a motion to enlarge the findings. April 2, 1976, the court made several additional findings, including a finding Lauren had not satisfied his burden to prove by a preponderance of the evidence the significant and material change in circumstances necessary to warrant a change in custody.

*Upon the father's appeal, we reverse.*

I. Principles governing appeals of this type are well established; it is their application which causes the court difficulties.

■ Our review, of course, is de novo. *In re Marriage of Gutermuth,* 246 N.W.2d 272 (Iowa 1976); *Baker v. Baker,* 243 N.W.2d 234, 235 (Iowa 1976); *Davis v. Davis,* 237 N.W.2d 455, 457 (Iowa 1976). We give weight to the fact findings of trial court, but will not abdicate our duty to review de novo and determine the issues presented upon the facts disclosed of record. Rule 344(f)(7), Rules of Civil Procedure; *Schoonover v. Schoonover,* 228 N.W.2d 31, 33 (Iowa 1975).

■■ Of course, our first and governing consideration is the best interests of the children, rule 344(f)(15), R.C.P.; *Zaerr v. Zaerr,* 222 N.W.2d 476, 477 (Iowa 1974). The question for us, as it was for trial court, is whether Lauren as noncustodial parent established by a preponderance of evidence that conditions since the court decree have so materially and substantially changed that the children's best interests make it expedient to award their custody to him. *Zaerr v. Zaerr,* supra, 222 N.W.2d at 477.

■ A change of circumstances within the intent of this rule is measured against certain criteria. The changed circumstances must be such as were not within the contemplation of the court when the former decree was entered. *Black v. Black,* 203 N.W.2d 121, 124 (Iowa 1972); *Pucci v. Pucci,* 259 Iowa 427, 433, 143 N.W.2d 353, 357 (Iowa 1966). The change must be substan-

tial and material, not trivial. *Zaerr v. Zaerr,* supra, 222 N.W.2d at 477. The change must be more or less permanent or continuous, not temporary. *Pucci v. Pucci,* supra, 259 Iowa at 433, 143 N.W.2d at 357; *Black v. Black,* supra, 203 N.W.2d at 124. Finally, the change must relate to the welfare of the children. *Brown v. Brown,* 261 Iowa 591, 594, 155 N.W.2d 426, 427 (1968).

■ Of course, the inference that a mother's custody best serves the interest of children of tender years no longer applies. *In re Marriage of Bowen,* 219 N.W.2d 683, 688 (Iowa 1974); see *Baker v. Baker,* supra, 243 N.W.2d at 235.

II. Keeping before us these principles, we turn to the evidence adduced at hearing.

Witness Mary E. Darrow testified she had been married 12 years. She and her husband have two children, ages 9 and 4. Lauren and Karin moved in across the street in 1967 or 1968 and the two families became friends. Mary "neighbored" with Karin until the latter moved on August 31, 1975.

This witness testified that following the divorce Karin, age 33, was entertaining a number of younger men, ages 17 to 24. There were 15 or 16 different men. About five nights a week men would stay overnight "and in the morning usually about 8:30, nine o'clock, they would leave, and their cycles would be parked in the driveway and stay there overnight." One "young guy" stayed for several days.

On some occasions she observed Karin leave at night on one of the motorcycles, leaving the boys unattended in the house. Mary testified Karin told her she was "funny because I didn't leave my kids, as long as they were sleeping, anyway, in the house at night."

Mary testified without objection that Mark told her "My mama has a different boyfriend every night", and "we don't have meals. We just eat what we find". Karin called Mary a "square" because she fed her children three meals a day and didn't permit them "to run the neighborhood". Mary observed the children "get their own things out of the cupboard on several occasions".

In the spring and summer of 1975 Mary noted Karin became "mean" while drinking. She would slap the children about the face and ears for no apparent reason. Without objection, Mary related an instance when Monty, the youngest child, arrived at her house to borrow a half cup of sugar. He was shaking and said his mother was mad. After he went home Karin called and "wanted to know if I was a cheapskate or if I didn't have any sugar." Mary replied she had understood she wanted half a cup. When Monty returned for additional sugar he was hysterical, sobbing, and had slap marks on his face. Mary observed the children were afraid of Karin and would shake when she came near.

Mary testified there were many times the children were locked out of the house. It would get dark and often they were without shirts. She observed them to have more colds and sickness in the spring and summer of 1975.

This witness stated the boys loved and respected their father. They would sit on the bus stop corner to await his coming and then accompany him down the street, one on each side, holding his hands.

On cross-examination Mary conceded she had "sort of a personality conflict" with Karin. We infer from the record this related to their differences concerning child rearing. It apparently did not interfere with their "neighboring", inhibit borrowing cooking ingredients, nor prevent visits in the other's home.

Lauren testified that when the stipulation was signed Karin represented to him, in the presence of the Cedar Rapids attorney who then represented her, she had no intention of ever moving from the homestead property because it was the boys' home. He was willing to stipulate the property away because he felt it was in the best interests of the boys to be in the home and he had liberal visitation rights. Lauren observed that portion of the stipulation which stated "That the respondent has continually been advised of his right of obtain-

ing an attorney of his choice concerning any of the dissolution matters and specifically concerning the stipulation and the Respondent further understands and does again hereby acknowledge that the law firm of Humphreys and Warner, 809 Merchants National Bank Building, Cedar Rapids, Linn County, Iowa, is acting for and in behalf of the Petitioner, Karin A. Hobson". Nonetheless, he executed the stipulation and quit claim deed assuming "she would go by her word, what she stated in the presence of her attorney". The attorney he alleged was present was never called by the petitioner to rebut Lauren's testimony.

Following the "very friendly" dissolution, Karin, according to Lauren, turned "hostile". At one point in the summer of 1975 Lauren observed a "for sale" sign on the homestead property. When he inquired if she was moving, and where, she replied "It's none of your damn business". In August the sign came down. Karin told Lauren she had taken the home off the market. She never indicated to him she was leaving. He first learned of this when he called to arrange visitation and found the phone disconnected.

Lauren testified he kept the boys for a total of six weeks in the summer of 1975, a portion of this time at Karin's request. He got along fine with his sons. He loved the boys and they loved him. When he returned them to Karin in his car, "I would have to ask them to get out of the car, and we would sit in the driveway maybe five minutes saying they're good boys and I would finally have to reach over and open the door to ask them to get out so I won't be late for work".

Testifying further, Lauren said he had little opportunity to observe the activity at Karin's home during the spring and summer of 1975. He stated, without objection, "The only indication I had, just one time, the boys were in their little whispering session and wanted to know if they could sleep without pajamas, and I asked them why, and they said, 'Mom does with her boyfriends all the time' ". Several Satur-

days when he picked them up for visitation the boys would be home alone.

This father testified he could and would provide for the day-to-day needs of his sons; he felt they would want to live with him. He stated his employment and finances made it impossible for him to go to Germany and search for his sons.

The record disclosed Lauren had been steadily employed for at least three years by Chicago & North Western Transportation Company. His earnings ranged from $11,172.85 to $12,136.01. In September of 1974 he commenced going to Kirkwood (College) half-time on the G.I. Bill. This additional $193 per month is not included in the above income figure and was to terminate June 1976.

The last child support payment Lauren made was October 15, 1975. Thereafter he deposited installments totalling $800 to a savings account in Guaranty Bank because, he testified, he didn't know where his wife and children were nor the circumstances under which they were living.

It is obvious trial court's disposition of this application turned in part on the following exchange after the attorneys declared the evidence closed:

"THE COURT: * * * Mr. Hobson, you have a way of not stating your answers in full. Your attorney asked you if you had any idea where your wife or sons are now, and you stated that you didn't. Is that exact? Where did he get this address that he mailed this letter to you [sic]? THE WITNESS: That is her mother's address that we got from the Friend of Court.

THE COURT: Well, then, you do have some idea, don't you? THE WITNESS: I don't think that she's there. Her attorney has another address. Mrs. Darrow, that was here, said a neighbor got a Christmas card from her with no return address, but said she was in Frankfurt. So I have no idea. She is in West Germany but as far as where—

THE COURT: Have you heard anything from either of your sons? THE WITNESS: Christmas I got a postcard

that said, 'Why don't you write. Mark.' And that's it.

THE COURT: Have you written?

THE WITNESS: No, sir. Mr. Mitvalsky [Lauren's lawyer] had the card there, and it has one return address on it and a postmark of another town.

THE COURT: Have you written?

THE WITNESS: No, sir.

THE COURT: You don't have any idea how your sons are being fed or clothed or taken care of? THE WITNESS: No, sir.

THE COURT: The Court is limited in these matters to answers that are given in response to questions by attorneys, and very seldom does the Court get into the questioning of witnesses, but this is the very thing I'm talking about. You were asked whether or not you had ever heard from your wife during or since she left here, and you stated, 'No', but it took a question from the Court to find out that you have heard from your children. Now, is there anything else I should know about this, or are we being devious? I want the whole story, not just part of it.

MR. MITVALSKY: Are you directing that to me, your honor?

THE COURT: Yes.

MR. MITVALSKY: There is nothing that I have done by way of my questions that has been with the intent of keeping something from the court.

THE COURT: Well then, why haven't you asked him about why he hasn't heard from his sons?

MR. MITVALSKY: I'll ask him.

THE COURT: No, I know now. Why didn't you go into this matter that you knew where she was? You gave me the impression that this woman disappeared into thin air some place and that he had no idea where they went.

\* \* \* \* \* \*

THE COURT: I'm not trying to be critical of you Mr. Mitvalsky. It just sometimes astounds me that attorneys bring these matters before the Court, but for some reason or another leave a little out here and there, and not that that

little out [sic], that what is left out is going to be particularly important, but to me this is a matter of total disclosure, not a matter of partial disclosure."

We do not condone Lauren's unilateral and unauthorized action in placing his support payments in savings rather than paying the clerk of court, although there is a body of law in other jurisdictions which might support him under these circumstances. See *Smith v. Smith,* 282 Minn. 190, 193–194, 163 N.W.2d 852 (1968); *Fish v. Fish,* 280 Minn. 316, 159 N.W.2d 271 (1968); Annot., 95 A.L.R.2d 118, 126 (1964). Compare, however, *Schneider v. Schneider,* 207 Iowa 189, 222 N.W. 400 (1928).

Nor do we approve Lauren's failure to respond to his son's cryptic communication. But we note he already had filed this application to secure custody of his sons and mailed notice to the address his wife left with the friend of court.

However, ignoring trial court's apparent post-trial abrogation of the adversary system, we cannot follow its implied conclusion Lauren knew where his wife was but deliberately concealed the fact from the court. His counsel told the court on opening statement he thought Karin and the children were in Germany. Karin's counsel then volunteered to stipulate they were in West Germany. Before the court was the district court file in this proceeding disclosing a December 16, 1975 order prescribing notice by publication and by airmail, and a return of service filed December 23, 1975 showing service by airmail on "Mrs. Karin A. Hobson, c/o Anna Ruhnke, Grazerdamn 205, 1 Berlin 41 Germany". Ruhnke was Karin's mother.

Neither can we find justification for trial court's conclusion Lauren or his counsel attempted to convey to the court "the impression that this woman disappeared into thin air some place and that he [Lauren] had no idea where they went". At least three potential residences, as opposed to a forwarding address, appear in the record. Karin's lawyer, making a professional statement at the request of opposing counsel, could not

state with certainty where his client actually lived in West Germany. In light of Karin's secretiveness, a forwarding address presents little basis for opportunity to investigate the current circumstances of the children. We believe that Karin, not Lauren, should be faulted for Lauren's lack of knowledge about the manner his sons were "being fed or clothed or taken care of".

We find even less support for trial court's finding Karin has merely taken a trip to Germany and that Lauren has "presented no evidence to indicate with any degree of certainty that the petitioner has permanently removed herself and the two children to Germany * * *." This finding is crucial, of course, because the burden is on Lauren to show the change of circumstances is more or less permanent or continuous, not temporary. *Black v. Black,* supra, 203 N.W.2d at 124; *Pucci v. Pucci,* supra, 259 Iowa at 433, 143 N.W.2d at 357.

While it is true the evidence disclosed Karin had, during the marriage, made prior visits to Germany, an entirely different set of circumstances surrounded this move. The house and all of the furniture were sold. A Germany forwarding address was left with the friend of court. Karin lulled Lauren's growing suspicions (resulting in his failure to take the matter to court while the children were still in Iowa) with a lie, representing that the home had been taken off the market. She did not tell him she was going to Germany or anywhere else. She has failed to communicate with Lauren concerning the children since her departure. We find Karin has permanently moved to an unknown residence in West Germany. Further, through stealth and deception, she has deliberately attempted to deprive these two boys, on a continuous basis, of an opportunity to see, know, and love their father.

In a case presenting less flagrant circumstances we found,

"[T]his mother's conduct in depriving these children of their right to see and know their father, is a most serious reflection on her capacity to retain custody. We have repeatedly said the best inter-

ests of children require a continuing association with their father unless the contrary is clearly shown."—*Spotts v. Spotts,* 197 N.W.2d 370, 372 (Iowa 1972).

See also *In re Marriage of Glass,* 213 N.W.2d 668, 670 (Iowa 1973); *Donovan v. Donovan,* 212 N.W.2d 451, 453 (Iowa 1973). While we did not change custody in *Spotts,* we said, 197 N.W.2d at 372, "Any continuation of this conduct will furnish ground for similar applications for modification and for contempt citation".

In *Spotts* we found the facts surrounding the mother's situation were no different from those developed at the divorce trial. That is not true here. The evidence discloses Karin's drinking to the point of meanness, her bizarre conduct with the motorcyclists, and her general neglect and abuse of the children followed the dissolution. Most of this evidence came in without objection. No evidence was presented in rebuttal. Karin's counsel neither asked for a hearing delay until she returned from her "trip", nor requested opportunity to rebut this evidence with Karin's deposition upon oral examination or written interrogatories. Trial court did not find this testimony unworthy of belief, it simply held the evidence insufficient to permit a change of custody.

We hold this evidence, coupled with our finding Karin has deliberately sought to permanently sever all relationship between the boys and their father, is sufficient to justify a custody change. The total situation satisfies all criteria, supra, by which we measure a change of circumstances to determine whether custody should be transferred. We find Lauren is steady, dependable, loves his children and is better qualified than Karin to minister to the long-range needs of Mark and Monty.

We are not dissuaded from this conclusion by the thesis advanced in Karin's brief "That the evidence, as submitted by the Respondent, fails to give the Court any grounds of advisability or necessity for the modification of custody, as the Respondent has no idea as to the children's present circumstances". An equity court becomes restless when a litigant who conceals the

children of the other party argues the latter can produce no evidence of their present circumstances.

Karin's planned efforts to deprive the boys of the right to see and know their father is a continuing and present circumstance. We will assume her immaturity and lack of judgment which was so obvious during the spring and summer of 1975, still demonstrated by her failure to disclose her place of residence, continued to date of hearing on the application.

██ No one disputes the jurisdiction of trial court or this court to modify the prior decree. *Van Gundy v. Van Gundy,* 244 Iowa 488, 56 N.W.2d 43 (1952); see *Eddards v. Suhr,* 193 N.W.2d 113 (Iowa 1971); *Call v. Call,* 250 Iowa 1175, 1177–1178, 98 N.W.2d 335, 336–337 (1959). Nor are we willing to make the concession which seems implied in other portions of trial court's findings and conclusions: that Karin has presented the court with a *fait accompli* which must somehow be accommodated in the disposition of this case. We will not assume a litigant in the courts of this state will disobey the court's decree.

III. Our above holding makes it unnecessary to treat other issues raised by Lauren except as hereinafter mentioned.

The decree entered below is reversed. This cause is remanded to trial court for modification of decree in conformance with this opinion and including the following provisions:

(1) Permanent custody of the children, Mark and Monty, is placed in the respondent Lauren A. Hobson, effective at once.

(2) Petitioner Karin A. Hobson shall file at once a verified statement in the office of the clerk of court setting forth the complete address of the residence where Mark and Monty presently live, and shall file an amendment specifying the address of any subsequent residence of these boys until the above custody change is actually implemented.

(3) Respondent Lauren A. Hobson shall pay air transportation for the children's return from Germany, pursuant to arrangements he shall make personally or through an intermediary in Germany whom he may select.

(4) Petitioner Karin A. Hobson shall not be required to pay child support and is granted visitation rights at all reasonable times.

(5) Petitioner Karin A. Hobson shall deliver to respondent the insurance policy on his life which she has in her possession. Respondent is granted the right to remove her name as one of the beneficiaries.

(6) Respondent Lauren A. Hobson shall pay to the clerk of court all child support payments due and owing up to and including the installment due February 15, 1976. He has no other obligation for child support payments.

(7) Petitioner Karin A. Hobson shall pay the court costs in this litigation.

(8) The district court shall retain jurisdiction of this matter to enforce this decree, to make such supplemental orders as may be necessary to effect the transfer of the boys from Germany to Cedar Rapids, and to implement petitioner's future visitation rights. Provided, however, petitioner shall not be permitted to remove the children from Iowa without posting adequate bond to secure their return.

REVERSED AND REMANDED WITH DIRECTIONS.