**In re the MARRIAGE OF Judith Ann DAY and Charles Lawrence Day.**

**Upon the Petition of Judith Ann Day, Appellant,**

**And Concerning Charles Lawrence Day, Appellee.**

**No. 65803.**

Supreme Court of Iowa.

Jan. 20, 1982.

Rehearing Denied Feb. 11, 1982.

Harlan M. Hockett and Joseph G. Bertogli of Flagg, Hockett, Benhart & Golden, Des Moines, for appellant.

Lawrence F. Scalise and Ann Fitzgibbons of Scalise, Scism, Gentry, Brick & Brick, Des Moines, for appellee.

Considered by REYNOLDSON, C. J., and UHLENHOPP, HARRIS, McGIVERIN and SCHULTZ, JJ.

REYNOLDSON, Chief Justice.

The petitioner mother, Judith Ann "Judy" Day, appealed from a district court ruling modifying a dissolution decree and awarding custody of the parties' three minor children to their father, respondent Charles Lawrence "Larry" Day. We transferred her appeal to the court of appeals, which reversed the district court. We granted further review and now affirm the court of appeals and remand to district court with directions.

Judy and Larry were married July 18, 1964. It was a second marriage for both. Their fourteen-year marriage was dissolved October 16, 1978. Judy was granted custody of the parties' three minor children: Michael, born November 28, 1962, a child of Judy's first marriage who was adopted by Larry; Adam, born June 7, 1967; and Dealynn, born August 12, 1968. May 28, 1980, Larry filed his application for modification, alleging Judy spent too much time away from the children and that the children wanted to live with him. Following a hearing on August 28, 1980, the court on September 16, 1980, entered an order modifying the decree.

I. Our rules relating to modification of custody decrees were summarized in *Hobson v. Hobson*, 248 N.W.2d 137, 139–40 (Iowa 1976), and need not be repeated here. The principal issue before us in our de novo review is whether Larry established by a preponderance of evidence that conditions following the dissolution decree have so materially and substantially changed that the children's best interests make it expedient to award their custody to him. *See In re Marriage of Mikelson*, 299 N.W.2d 670, 671 (Iowa 1980). In carrying this burden, Larry must show some superior claim based on his ability to minister, not equally but more

effectively, to the children's well-being. *See In re Marriage of Ivins*, 308 N.W.2d 75, 78 (Iowa 1981).

II. From our careful examination of this record we conclude the present dispute stems from Larry's refusal to accept the property and custodial provisions of the dissolution decree, although he took no appeal from those determinations.

In view of Larry's present complaints, the following portion of the dissolution decree is significant:

There has been a child custody issue litigated at great length. The conduct of the Petitioner with a married man was brought out. It is not a matter to be condoned, and the Court gives it consideration. It does appear that this conduct was not to any great extent carried on so that the children were exposed.

Considering all the evidence, including the activities of the parties during the time there was harmony in the family, their interest and participation in the children's activities, their availability to supervise the children, the Court now awards custody to the Petitioner with visitation to the Respondent. In making this decision the Court considers the fact that after the Respondent discovered the misconduct of the Petitioner, he offered custody to Petitioner provided she accept his figures in the property settlement. The Court recognizes that offers of compromise are generally not to be considered as evidence. In this case, however, Respondent agreed to give Petitioner custody which this Court considers as a recognition that Petitioner is a suitable and proper person to have custody. The Court considers the recommendation of the attorney [appointed for the children] in making this provision for custody.

When this family was united they lived on Larry's 160-acre farm located within the Grimes, Iowa, city limits. After these parties separated Judy moved to Carlisle, Iowa, with the three children. Because the eldest child, Michael, wanted to return to the Grimes school, Judy rented a house in Grimes as soon as the dissolution decree

was filed in October 1978. It was not until December that Larry paid the property division lump-sum that under the decree was to be paid at once. Judy did not receive an alimony award, was trying to establish herself in employment, and was borrowing money. For several months she had no money for a baby-sitter to care for the children, then ages 15, 11, and 10, when they came home from school.

Although Larry was always delinquent in his child support payments, he hired a private detective to follow Judy and report on her conduct, and canvass the neighborhood to determine whether Judy was a good mother. The detective found a neighbor, Jane Hargens, who did not work outside the home and who testified that she found Dealynn apparently locked out on the front step of Judy's house, and invited her into the Hargens home. This happened "just once in a great while" when Judy was at work. She had some question about Dealynn's cleanliness during this period, which may have resulted from gym activities. She also related an incident concerning the son, Adam, who with another boy was burning newspapers near some parked cars. Judy testified she provided all three children with keys to the house, that she had the children call her after school and tell her where they were, and as soon as she could afford it she hired a sitter. Mrs. Hargens testified that after Judy remarried "things" improved, the family was on a regular routine, and Judy and her husband spent a lot of time "with the kids at home in the evening."

Linda Boatright, another neighbor who had reported some teenagers to the police, testified Michael was among a group that "egged" her home on Halloween in 1979. On a different occasion Michael had been a passenger on the back of a moped that was driven through her yard. Judy reacted angrily when Mr. Boatright yelled at the boys, but came to the home and apologized when she learned what had happened. Mrs. Boatright opined Adam could be a nice boy but was "ornery" and "mouthy," although she had no children his age and Adam did not play in her yard or home.

On the other hand, there was strong testimony from three closer neighbors that Judy was a concerned parent, that the children were ordinarily well-behaved, happy, clean, and well-groomed, that Judy was a good housekeeper, and that there was demonstrated love and affection between Judy and the three children. Judy took the children, sometimes with her husband, roller-skating, picnicing, swimming, and to the movies. Mrs. Wolski, who had baby-sat with the children, confirmed Judy's observation that they were less cooperative and sometimes disobedient when they returned from a visit with Larry. Judy's present husband, Dick Hollander, was described by these witnesses as a likable person, concerned about and affectionate toward children, and liked and respected by them in return. Judy testified without contradiction that the family went to church on Sunday and that Dealynn had a special church group she attended on Thursday evenings.

III. Larry concentrates on Judy's problems with Michael. At age 17 Michael had a 3 to 11 p. m. job, his own car registered in Judy's name, and a fifteen-year-old girlfriend who was in conflict with her mother. The uncontroverted evidence is that Judy was alarmed and concerned about Michael, and tried to talk and reason with him, as did her husband. She refused to let Michael share a bed with his friend in her home and refused to let the girl sleep in Michael's car on the street. When she told Michael that his friend, who did not have a driver's license, could not drive his car while it was registered in her name, he replied, "Yeah, that is what Dad said you were going to do." Michael became angry, left Judy's home, and did not return. He rented a house from a long-time friend of these parties, "Uncle" Joe Zaleski. Larry argues this trouble was caused by Judy's "double standard," because Michael was aware that before her remarriage Judy's present husband occasionally spent the night in her home when the younger children were away. Although the court does not condone her conduct in this regard, it is only

speculative that it was a contributing factor in Michael's problems. On the other hand, the record contains no evidence that Larry sought to be helpful in this situation. His contribution was to tell Michael that Judy had met "many, many men in motels" while she was married to him, which Judy denied under oath. Nonetheless, Michael confronted her with this information.

Michael is now an adult and his custody is no longer an issue in this proceeding. On balance, if one of these parents is to be assigned primary blame for Michael's situation we are unable to make the selection.

IV. From the beginning Larry refused to follow the decree as to visitation with the two youngest children. Michael stopped by his father's house but did not stay on visitation weekends. Larry was granted visitation on alternate weekends from 6 p. m. Friday to 6 p. m. Sunday. He refused to pick up the children or return them to Judy's home. Larry testified this was because Judy had complained when he delivered to her home and in her absence some of the personal property she was awarded. Judy testified without contradiction that Larry telephoned her that he would not come to the house because "I will not come and beg for my children." He refused to communicate with Judy as to when he was picking up the children or returning them, or even whether he was going to be home on the weekend of his scheduled visitation. Larry would either pick up the children and drop them off at a neighborhood grocery store at irregular hours, or have the school bus deliver them to his home Friday afternoon and return them to school Monday morning. This meant that Judy was required to leave the children's weekend clothes in a box on Larry's porch Friday and retrieve them from the same place on Monday. This she did without complaint until December 25, 1979, when she called Larry about visitation after he had just been served papers by the friend of court for nonpayment of child support. After complaining about that, Larry told her "I will not stop bothering you until you or I are dead." Based upon her knowledge that Larry had carried a gun and that she had

sustained physical injury from him, she interpreted this as a threat. She parked her car at a different location nearer her place of employment and had others go with her in delivering and picking up the children's clothes until February 1980, when her husband, concerned about her safety, asked her to stop. The evidence in this record is virtually uncontested that Judy made every effort to encourage the children's visitations and relationships with their father, and did nothing to alienate the children from him.

There is a clear inference, however, that Larry attempted to manipulate the children and alienate them from their mother. He told them he was very poor, could not heat his house, and that she took everything away from him including land that had been in the Day family for a long time. The record discloses the dissolution court awarded her a lump-sum settlement and 40 acres of the 160-acre farm. Larry testified this was unfair, but nonetheless testified his interest in the remaining land was worth a half-million dollars.

This application for modification was filed May 28, 1980. In June after school was out Judy permitted the children to go several days early for visitation with their father. When they had not been returned by Monday morning she telephoned Larry. He told her that the children did not want to see her or talk to her, that they wanted to live with him, and that if she came to the farm there would be "trouble." She closed the store where she worked and went to find them. She finally found Larry in the yard at his brother Steven's house. Steven ordered her from the premises. Larry would not tell her where the children were. She called for them and later learned they were upstairs with Steven's wife, who would not let them answer the door or her calls. When she returned to work she was told by a friend of Dealynn's that there would be softball practice that afternoon. She asked the friend to call Larry because she knew Dealynn would want to practice. Testifying about this incident, Larry stated that when the hearing on his application

was delayed he told his lawyer "I am sorry, but we have to do something about this." He testified he thought it was fair to ask "the children where they wanted to stay, and I was abiding by their desires." On the way to the ball park he told the children "that their mother might very well be there and there might be trouble." Deputy Sheriff Strain, a friend of Larry's, talked to Larry at his home before the ball park incident and later appeared at the ball park. It is undisputed that the children were emotionally upset, crying, and reluctant to leave with their mother. Larry and Judy had a verbal altercation in which Larry called her names and complained about his child support obligation. Strain, called as a witness by Larry, testified on cross-examination he thought the conflict came about because of Larry's undertaking to gain custody of the two children and that he would not want to see the children put through another such incident. Strain persuaded Larry to release the children to their mother. During part of this episode, Larry, a professional photographer, busied himself taking pictures of the children crying while Judy was trying to talk to and calm them. After that encounter Judy became concerned and apprehensive about what Larry might do in the future to traumatize the children. This fear accounted for the incident discussed in the next division.

V. Larry's major complaint, and trial court's custody-change ruling, turned on Judy's removal of the two younger children to another state without informing Larry, the neighbors, or the three children a move was being made. To put this decision in perspective, it should be noted that Judy's remarriage to Dick Hollander occurred in December 1979. He was employed in sales by Allied Farm Equipment, and took a new territory in southeast Iowa so that he could live in Grimes and Judy and the children would not be required to move. In May 1980 his was one of several territories closed and he found himself unemployed. He sold insurance on commission for a short while, then through his former employer he acquired lucrative employment as a territorial sales manager, traveling out of Bowling Green, Kentucky, for Heston Corporation.

Heston offered Dick the Kentucky employment July 14, 1980. Dick did not accept until the latter part of July, and Heston then instructed him to be on the job by August 15. Judy learned school started in Kentucky August 18. She was determined to make the move without the risk of Larry creating an emotional situation for the children. She and Dick did not tell the neighbors they were moving. They told the children they were going on a vacation and left August 13, 1980. They took the personal belongings Michael had not removed from the home and put them in "Uncle" Joe Zaleski's garage. When the family arrived in Bowling Green, Judy telephoned Larry and left a message on his recorder as to their location. She called again with a telephone number and home address as soon as this information was available. When she called her lawyer, whom she thought had been on vacation, he told her the hearing on the modification application was set for August 28. She and Dick returned to Iowa for that purpose and produced the two children when the court wanted to talk to them.

We do not condone Judy's subterfuge in the move from Iowa, although we are convinced by the record that her fears of Larry's reaction and the resulting emotional stress on the children were justified. Larry's complaints about Judy's conduct must be viewed in light of his taking the children, one at a time, on motorcycle trips through several states on a number of occasions without informing Judy they were going or where they were. Nothing in the dissolution decree prevented either party from removing the children from Iowa. In similar circumstances, we have held a removal of children from the state, in our highly mobile society and for good economic reasons, provided no justification for a custodial change. *In re Marriage of Lower*, 269 N.W.2d 822, 826–27 (Iowa 1978); *Smith v. Smith*, 257 Iowa 584, 590, 133 N.W.2d 677, 680–81 (1965); see *In re Marriage of Gütermuth*, 246 N.W.2d 272, 275–76 (Iowa 1976).

We agree with the court of appeals that the controlling fact in trial court's determination to transfer custody of the

children to Larry was the secretive removal of the two younger children from Iowa. In an oral finding from the bench trial court stated on the record:

I am making my decision based on the fact that my feeling is the best interests of these children would not be served by continuing their custody in a deceitful situation, because the atmosphere of deceit, for whatever good reason it may have been started, will not now in my mind continue to create an atmosphere that will be for the best interests of these children.

For that reason, I have decided that the custody of these children ... should be changed to their father ... immediately.

That reason, given the circumstances of this case, is insufficient to justify a change of custody. Nor do we find any other ground or grounds in this record that would justify a change. Photographs of the Hollanders' Bowling Green home are in evidence. It is a large modern structure, nicely furnished, with a swimming pool. It is on a street with a number of children with whom Adam and Dealynn were becoming acquainted. There is strong evidence that Judy is a good mother. The reported discussion between trial court and the children produced no definitive evidence. Fortunately they were not asked to make a custody selection between their parents.

Larry furnished only his own testimony that the children preferred to live with him, other than the evidence of their reaction in the ball park incident. He furnished little evidence other than his own testimony relating to his ability to care for and parent the children. His home and farm were listed for sale up to two weeks before the hearing. Although the evidence and his own testimony reflect this farm was very valuable and that he was pursuing his profession, he was thousands of dollars delinquent in his child support and apparently paid toward it only intermittently. He was cited into court four times for nonpayment. He never applied for a modification to reduce his support payments. We have characterized the requirement to pay child support as a "basic obligation" of a parent.

*Klobnock v. Abbott,* 303 N.W.2d 149, 152 (Iowa 1981); *see* § 597.14, The Code. Larry's neglect of his basic obligation to these children does not persuade us to trust him with more responsibility.

We affirm the court of appeals' opinion in its reversal of trial court's ruling. We remand to trial court for decree in conformance herewith, the decree to modify Larry's visitation rights as provided below.

Larry shall have visitation at his home with Adam and Dealynn for three weeks each summer, a week on alternate Christmas vacations commencing in 1982, and on each Easter or spring vacation, if any, commencing in 1983. He shall pay the expense to transport the children to his home; Judy shall pay for their return to her home. Although we realize he may not be able to avail himself of the opportunity, he may telephone or visit the children (but not remove them from their residence city) on alternate weekends commencing eight weeks following trial court's ruling. Judy must be informed in writing of Larry's plans for each visitation at least three weeks in advance.

DECISION OF COURT OF APPEALS AFFIRMED; REMANDED WITH DIRECTIONS.