# IN THE COURT OF APPEALS OF IOWA

No. 24-0896
Filed May 21, 2025

IN RE THE MARRIAGE OF DAWN JEANNINE FLIEDER
AND SCOTT ALLEN FLIEDER

Upon the Petition of
**DAWN JEANNINE FLIEDER, n/k/a DAWN JEANNINE COOK,**
    Petitioner-Appellant,

**And Concerning**
**SCOTT ALLEN FLIEDER,**
    Respondent-Appellee.

_____

Appeal from the Iowa District Court for Woodbury County, James N. Daane,

Judge.

A former spouse appeals from a ruling modifying physical care of the

parties' two children. **AFFIRMED.**

John S. Moeller of John S. Moeller, P.C., Sioux City, for appellant.

Robert B. Deck, Sioux City, for appellee.

Considered without oral argument by Ahlers, P.J., and Badding and

Buller, JJ.

**BADDING, Judge.**

Faced with what it saw as a choice "between the lesser of two evils," the district court granted Scott Flieder's modification petition for physical care of his two children with Dawn Cook. In doing so, the court balanced Scott's failure to pay any child support to Dawn since their dissolution decree, among other faults, against Dawn's "calculated, secretive, and long-lasting" decision to leave the children in her mother's care while she worked out of state. Dawn appeals, claiming that her "heavy reliance upon her mother to assist in raising the children does not make Scott a superior parent." We affirm the court's decision upon our de novo review of this close case.

**I.    Background Facts and Proceedings**

Scott and Dawn started dating in 2007, shortly after Scott was released from prison for "statutory rape."[1] Their oldest child, L.F., was born in 2009. Scott and Dawn married in January 2010, and their second child, K.F., was born in 2011. The next year, Dawn petitioned for divorce. Following a trial in 2014, the district court entered a dissolution decree placing the children in the parties' joint legal custody and Dawn's physical care with visitation for Scott. The children are now fifteen and thirteen years old.

During the marriage, Dawn worked at an airline in Sioux City. Scott was employed with a pilot-car service, although he lost that job just before the dissolution trial. The district court imputed an income to Scott in the dissolution decree and ordered him to pay $527 per month in child support. After the divorce,

---

[1] The record did not contain any details about the exact conviction or convictions that landed Scott in prison.

Scott found a new job as an over-the-road escort for oversized loads. That job required Scott to travel, so he did not see the children regularly.

Scott testified that in roughly 2015, he became disabled because of various ailments, including "blood clots, IVC filters, pulmonary embolisms," and his left shoulder, which he had "replaced a few times." He applied for social security disability benefits a few times but was denied. Even though Scott was not working, he did not have consistent visits. Scott claimed this was because Dawn told him that "it was problematic for the children." Dawn, however, testified that her relationship with Scott was amicable,[2] and she would let him see the children when he asked—which was sporadically.

In 2017, Dawn accepted a position as a customer service manager with an airline in Chicago. She moved there in February. The children—who had been staying with Dawn's parents at their residence in a small town near Sioux City—followed the next month. Dawn did not tell Scott they were moving to Chicago because she "didn't want a fight." Scott found out about the move when he went to pick the children up after school, and they weren't there. Scott had one visit with the children while they were in Chicago and minimal phone contact because he "would call and a lot of times would not get an answer."

Dawn and the children lived in Chicago until August 2018, when Dawn's position was transferred to Philadelphia. She decided to move the children back

---

[2] However, Dawn also testified that Scott was physically abusive after the divorce. She described an incident in 2016 when he bent her thumb backwards and bruised her leg and another when he forced his way into her house and held her up against the wall. Scott did not deny these incidents, testifying: "There was a lot of abuse between both of us. . . . We were very abusive. Very physical couple."

to Iowa and into her parents' house while she stayed in Philadelphia to work. Dawn testified that her schedule in Philadelphia was "very flexible," so she could fly back and forth "if not every week, every other week." In November 2022, Dawn testified that she obtained a new job with a different airline based out of Denver and flew back to Iowa every weekend. She remained in Denver until August 2023, when she left the airline industry for a job as an administrative assistant with a law-enforcement-training organization in Philadelphia. Since her job in Chicago, Dawn has stayed at "crash pads" in the cities where she was working, which she described as places where aviation professionals would rent rooms to stay in while they were working. Dawn maintained that her permanent residence was in Iowa with the children.

Dawn did not tell Scott about any of this, including her decision to move the children back to Iowa to live with her parents. But from 2018 until 2022, Dawn testified that Scott would see the children "[e]very other weekend if he was available," or sometimes "he would do two weekends [in] a row and not two weekends. It was very amicable as far as what was happening in his life." Scott described his visitation with the children during this time as periodic, noting that until recently, he did not even know where they were going to school because he "was not placed on any of the school stuff." When asked how that was possible, Scott replied, "I didn't care where they were going to school. I was happy to see my children."

Beginning in 2022, Scott started taking a more active role in the children's lives. He talked to them every day, picked them up from school, and met with their teachers and principals. He also had regular conversations with Dawn's mother,

Lott, about the children, who Scott said were becoming more than she could handle. He testified that at Dawn's parents' house, K.F. "is given electronics to babysit him or to subdue" his attention deficit disorder,[3] while L.F. "is being placed in a motherly role that is unacceptable for any child her age." Scott explained that L.F., who was fourteen at the modification trial,

> is responsible to pick up Dawn's mail and make sure that it gets put into the mail to Philadelphia. [She] is responsible for making sure that [K.F.] gets up for school. [She] is responsible to make sure that [K.F.] takes his medicine. [She] is responsible for every aspect that a mother or a father should be responsible for.

Scott testified that L.F. called him every morning to help get K.F. out of bed because he would not wake up for his grandmother. The children also called him when they were fighting with one another or their grandparents.

It was one of those fights that led to Scott's petition to modify the dissolution decree. L.F. called him crying in April 2023 because of an argument between K.F. and their grandmother. Scott drove to their house, and Lott agreed to let him take the children for the weekend to give her a break. But because he was concerned about Lott's ability to continue parenting the children in Dawn's absence, Scott kept them in his care and applied to modify the dissolution decree at the end of April. In mid-May, Dawn flew back to Iowa, picked the children up early from school, and returned them to her parents' house.

During the three weeks when the children were in Scott's care, Dawn said that K.F. had behavior problems at school: "He was getting into physical altercations with other students, he made a racist comment to another student, and

---

[3] K.F.'s medical records show that he was diagnosed with attention deficit hyperactivity disorder, but Dawn insisted that he "never had any hyperactivity."

he was talking about inappropriate things." Dawn, who is Asian, blamed the racist comment on Scott, testifying that he "will make derogatory statements towards anybody . . . that wasn't white." Scott acknowledged that he had made racially derogatory comments in the past, which he attributed to his time in prison before he and Dawn started dating in 2007. Scott explained that he "carried a very large chip on [his] shoulder" from that "very racially divided" prison environment. In the years since his release, Scott testified that he tried "very hard not to have that issue, especially in front of the kids."

Dawn also testified that when K.F. was in Scott's care, he brought a knife to school. Scott admitted that he had given the twelve-year-old child a Swiss Army knife as a "utilitarian tool." But Scott testified that was not the knife that K.F. brought to school. Instead, it was one K.F. found on the ground by the school bus. Dawn was additionally concerned about Scott's stance on K.F.'s attention deficit disorder, testifying that he was resistant to giving K.F. medicine when he was first diagnosed in 2021. Scott, however, testified that after Dawn asked him to help pay for K.F.'s medication, he started picking it up from the pharmacy for him. But, as Dawn pointed out, Scott forgot to give K.F. his medication one day and called the school to see if they could give him a "placebo."

In any event, Dawn and Scott agreed that K.F.'s attention deficit disorder caused problems at school. He has been on an individualized education plan since first grade because of "difficulty with comprehension." Dawn attributed that to his disorder, but she waited to have him evaluated because she "didn't feel that medication was good for children until they get a little bit older." Dawn's mother, Lott, brought K.F. to his initial evaluation for the disorder, like she did for most of

the children's routine medical appointments. Dawn would schedule those appointments and participate by telephone, but she did not tell Scott about them. The patient history section of K.F.'s medical records notes: "Grandma is the primary caretaker. Mom in Philadelphia, speaks to everyday. Dad lives here and sees on weekends, talks to often also."

Lott confirmed that she had been raising the children, testifying: "I'm the grandmother and the kids live with me and they go to school in my house." According to Lott, Dawn only flew back to see the children about every three weeks and stayed for three days and two nights—much less than what Dawn testified to. When Dawn was in town, she would go grocery shopping and take the children out to eat. She would also give Lott "a couple hundred dollars" to use if the children needed to buy birthday presents for their friends, but nothing for them living with her. When asked whether the children were harder for her to watch as they got older, Lott answered, "Not really." But she testified they should be living with one of their parents, preferably Dawn.

By the modification trial in December 2023, Scott owed Dawn $73,400 in past-due child support, which she sought to enforce through a contempt action that she filed after Scott's modification petition. Scott and his new wife, Melissa, planned to refinance Melissa's house in Sioux City and use the proceeds to satisfy the debt. Scott married Melissa the month before the trial, although they had been dating since his separation from Dawn and engaged since 2018. Scott lived with Melissa and her children off and on before they got married, even while he was

still on the sex offender registry.[4]   When he was not living with Melissa, Scott resided in Sioux City with his mother or friends.  Since he became disabled, Scott's mother has helped support him, although Scott hoped that his most recent application for social security disability benefits would succeed.

Dawn testified that she wanted the children to move to Philadelphia with her, as she requested in her counterclaim to Scott's modification petition, but she recognized that she needed to find a residence there.  While the children had expressed some anxiety about moving, Dawn testified it was in their best interest because "they've always been with me, and I support them in seeing their father and experiencing different cultures, life, and showing them how you can prosper." For his part, Scott testified that Dawn "hasn't lived here in a very long time.  She promised that she would be . . . back every other weekend, yet even her mom says she's here every three weeks at best."  Scott did not believe that Dawn was "in any position to satisfy the needs of the children as far as school, doctors, personal life situations, all of which Lott and I have been dealing with for a number of years now."  In the end, Scott bluntly said, "The point is it's time for one of us to step up and grow up and be a fucking parent.  Excuse my language."

After hearing this evidence, the district court entered a detailed, forty-five page ruling that found:

> The resolution of the dilemma this couple presents to the court is not an easy one.  It is difficult to condone Dawn's actions in secreting the children's moves from Scott, and actively working to cover her absences in order to preserve the status quo, but it is also difficult not to admire how she has worked to survive and to preserve her family when she was receiving $0 dollars [in] child support.  It is

---

[4] Scott testified that he got off the sex offender registry a few years before the modification trial.

equally difficult to condone Scott's actions . . . although most of Scott's mistakes were individual incidental ones, while Dawn's were calculated, secretive and long-lasting.  It is also difficult to look away from the fact that Scott has not paid one dollar of child support in over a decade, which put significant strain on Dawn's ability to lead a normal life with their children.

The court framed the decision before it as a choice

between the lesser of the two evils. . . .  Is it in the children's best interest to permit them to remain living with Lott, with remote supervision by Dawn and limited involvement by Scott, or to make a custody change that would permit the children to live on a daily basis with the parent with whom they have never resided?  On its face, the presumption would be the [former] option, as the law strongly supports the children living with the parent with whom they have primarily lived in the past.  But here, the children have not actually [been] residing with Dawn for some time.  The decision is then further complicated by Scott's history, including his previous transient lifestyle, his bad choices, and his brand-new marriage with a woman in whose house he is now living at her pleasure.

(Footnote omitted.)

After weighing these considerations and the factors set out in Iowa Code section 598.41(3) (2023), the court concluded it was in the children's best interests to grant Scott's petition to modify their physical care.[5]  The court found the children should finish the school year with their grandparents before transitioning to Scott's care during the summer of 2024.  The court entered a liberal visitation schedule for Dawn that approximated her contact with the children in the years preceding the modification.  In closing, the court stated:

---

[5] Although the court framed the choice before it as a binary one, Dawn did present a third option in her counterclaim to Scott's modification petition—allowing her to relocate the children to Philadelphia.  While the court did not expressly address that option in its ruling, it implicitly rejected Dawn's request by modifying the dissolution decree to place the children in Scott's physical care.  *See Meier v. Senecaut*, 641 N.W.2d 532, 530–40 (Iowa 2002) (assuming "the district court rejected claims not specifically addressed" when error preservation is not at issue).

It is not lost on the court that Scott's non-payment of support has contributed to Dawn's need to try to earn more income to support herself, which she decided required her to move from Sioux City to a larger city, but the court's recognition of that inequity, while it may be grounds for contempt,[6] is not grounds for Dawn to retain physical care when she has not been actually exercising primary physical care for many years.

## II.      Analysis

Because petitions to modify the physical care provisions of a dissolution decree lie in equity, our review is de novo. *In re Marriage of Hoffman*, 867 N.W.2d 26, 32 (Iowa 2015). "But when we say a case is reviewed de novo, this does not mean that we decide the case in a vacuum or approach it as though the trial court had never been involved." *Hora v. Hora*, 5 N.W.3d 635, 645 (Iowa 2024) (cleaned up). Instead, "while not bound by the district court's findings, we give them weight and defer especially where the credibility of witnesses is a factor in the outcome." *Id.* (cleaned up); *accord Hoffman*, 867 N.W.2d at 32.

Credibility was a factor here, which we keep in mind as we apply the well-established standard for modifications:

> To change a custodial provision of a dissolution decree, the applying party must establish by a preponderance of evidence that conditions since the decree was entered have so materially and substantially changed that the children's best interests make it expedient to make the requested change. The changed circumstances must not have been contemplated by the court when the decree was entered, and they must be more or less permanent, not temporary. They must relate to the welfare of the children. A parent seeking to take custody from the other must prove an ability to minister more effectively to the children's well being.

*Hoffman*, 867 N.W.2d at 32.

---

[6] The court's ruling noted that a hearing on Dawn's contempt application was held in November, and a "decision on that contempt application remains under advisement." The resolution of that application is not in the record before us.

This standard places a heavy burden on the moving party because of the fundamental policy that "once custody of children has been fixed it should be disturbed only for the most cogent reasons." *Id.* (citation omitted). The controlling consideration, however, is the children's best interests, which "provides the flexibility necessary to consider unique custody issues on a case-by-case basis." *Id.* (citation omitted); *see also In re Marriage of Cowern*, No. 23-1240, 2024 WL 2045686, at *2 (Iowa Ct. App. May 8, 2024) (noting "modification petitions rise and fall on their own facts" and "prior cases have little precedential value" (citation omitted)).

On appeal, Dawn does not challenge the district court's finding that there was a substantial change in circumstances warranting modification. Instead, she claims the court erred in determining Scott "met his burden that he is the superior parent to minister to the children's well being" and denying her request to "move with the children out of state."

Dawn first points to Scott's failure to pay "one cent of child support" and argues that "should be a factor in the determination of physical care." We agree Scott wholly neglected that basic obligation of being a parent, which is a factor in determining physical care. *See In re Marriage of Day*, 314 N.W.2d 416, 421 (Iowa 1982). The district court wrestled with how that failure impacted its decision but ultimately determined it was outweighed by Dawn's subterfuge and absence from the children's lives. These were appropriate considerations that tipped the scales in Scott's favor, as the court explained in a ruling on Dawn's post-trial motion to enlarge or amend:

[T]he most salient (and cogent) factors . . . justifying modification of physical care were the facts that Dawn had not actually been exercising primary physical care for many years and had been secreting that fact from Scott, and that Scott had been, for a substantial recent period, providing near daily emotional and routine physical care support to the children and to the children's actual primary caregiver, Dawn's mother.

Our statute requires the district court to "consider the denial by one parent of the child's opportunity for maximum continuing contact with the other parent, without just cause, a significant factor in determining the proper custody arrangement."[7] *Id.* § 598.41(1)(c). The court must also consider "[w]hether the parents can support the other parent's relationship with the child." *Id.* § 598.41(3)(e). Because of the importance of "'maintain[ing] meaningful relations with both parents,' a parent's actions showing an intent to 'separate' a child from the other parent, 'emotionally and physically,' has often been a strong basis to modify physical care from one parent to the other." *Shepherd v. Briley*, No. 23-0593, 2024 WL 470356, at *3 (Iowa Ct. App. Feb. 7, 2024) (quoting *In re Marriage of Leyda*, 355 N.W.2d 862, 866–67 (Iowa 1984)); *see also In re Marriage of Awe*, No. 24-0055, 2024 WL 4039567, at *1–2 (Iowa Ct. App. Sept. 4, 2024) (affirming modification of physical care where the mother moved 300 miles away with the children, lied to the father about where they were, and enrolled them in a different school without his knowledge). The court's ruling recognized these principles.

---

[7] "Just cause may include a determination by the court . . . that a history of domestic abuse exists between the parents." Iowa Code § 598.41(1)(c); *see also id.* § 598.41(3)(j). While Dawn testified that Scott physically abused her after the divorce, she does not argue on appeal that a history of domestic abuse existed, that the district court erred in failing to apply these provisions, or that Scott's conduct should have precluded placing the children in his physical care. Nor did she testify that she surreptitiously moved to Chicago with the children because of Scott's abuse. Instead, she consistently described their relationship as amicable.

Not only did Dawn hide the children's move to Chicago, their return to Iowa, and her out-of-state residences from Scott, she failed for many years to notify him about their medical or educational needs. We acknowledge, as did the district court, that some of Dawn's moves may have been motivated by Scott's failure to pay child support. *Cf. In re Marriage of Lapke*, No. 04-1595, 2005 WL 1225939, at *3 (Iowa Ct. App. May 25, 2005) (noting the impact of a custodial parent's move is of greater concern than the motivations for the move). But Dawn was contemplating a move even at the dissolution trial, where she sought a provision allowing her "to move or relocate with the children for her job with the airlines." The dissolution court denied that request, ruling it was "not inclined to predetermine" that potential modification issue. Rather than filing a modification when she moved—or at least telling Scott where she and the children were—Dawn hid that information from him. As the district court found in its modification ruling, Dawn "knew that she was not permitted to unilaterally make that decision but did it anyway."

Dawn also argues that Scott's "visitation and interactions with the children have been sporadic," and he was "mostly uninvolved with the children's education." That was true up until 2022—although Scott blamed some of that on Dawn. But, as the district court found, Scott "has recently been much more responsible in acting as a father for the children. . . . On a day-to-day basis, Scott has, for at least most of the last several years, been available to the children for guidance and support." Dawn, in contrast, has left the children in her mother's care since 2018. While our case law "places greater importance on the stability of the relationship between the child and the primary caregiver over the physical setting of the child,"

*In re Marriage of Williams*, 589 N.W.2d 759, 762 (Iowa Ct. App. 1998), the district court found the record did not support Dawn's claim that she was "providing routine, if not daily, care for the children." We agree and defer to that credibility finding.

In doing so, we note that the "deference we pay to trial court findings is especially strong here" because the case turned "not so much on what was said and done, as upon the implications of the words and actions of the parties." *In re Marriage of Udelhofen*, 444 N.W.2d 473, 474 (Iowa 1989). "In resolving such a case a trial court, as first-hand observer of witnesses holds a distinct advantage over an appellate court, which necessarily must rely on a cold transcript." *Id.*; *accord Hora*, 5 N.W.3d at 645; *In re Marriage of Vrban*, 359 N.W.2d 420, 423 (Iowa 1984). "[T]his advantage 'greatly help[s]' the district court 'in making a wise decision about the parties' and their children." *Awe*, 2024 WL 4039567, at *2 (quoting *Vrban*, 359 N.W.2d at 423).

To be sure, Scott has his faults. But as "we focus on the best interests of the children, we consider the emotional and environmental stability offered by each parent." *Williams*, 589 N.W.2d at 762. "[T]hat which is least disruptive emotionally to the child should be given greatest consideration in achieving the ultimate goal of the child's long-term best interests." *Id.* Except for the year-and-a-half when they lived in Chicago, the children have always resided in the Sioux City area, where Scott and his family also live. Scott has a good relationship with Dawn's parents and, before the modification was filed, was able to communicate well with Dawn. In this close case, we give weight to the district court's determination that the least emotionally disruptive result for the children—and the one that is in their

best interests—is transferring physical care to Scott and denying Dawn's request to move the children to Philadelphia with her.  *See In re Marriage of Reed*, No. 09-0029, 2009 WL 4122884, at \*6 (Iowa Ct. App. Nov. 25, 2009) ("In close cases such as this, we give careful consideration to the district court's findings.").  We accordingly affirm the court's decision to modify the physical care provisions of the parties' dissolution decree.

**AFFIRMED.**

Ahlers, P.J., concurs; Buller, J., dissents.

**BULLER, Judge** (dissenting).

In my view, the majority affirms a serious mistake in placing custody of these children with a father who is an unemployed convicted sex offender and admitted domestic abuser, has limited to no experience meaningfully parenting the children on his own, and has never paid a dime of child support. I cannot join the majority opinion and therefore dissent.

First, the record is sparse on the details of conviction, but Scott admits to a conviction for "statutory rape" and that his placement on the sex-offender registry complicated living with his new wife while her children were in the house. He served about a decade in prison for this and a burglary charge and has barely worked since then. In my reading of the record (and seemingly the district court's), Scott only decided to petition for custody once his term of sex-offender registration had concluded. He then hurriedly married—without telling or inviting the children—six months after filing for modification and just a week after a contempt hearing regarding his massive child support arrears, with plans to refinance his new wife's home to pay the debt.

Scott also admitted to perpetrating domestic violence against Dawn. She credibly described how he battered her when she refused to have sex with him while they were separated. And she convincingly described how he became jealous and violent whenever she started dating someone new.

Even the district court, which ruled in favor of Scott, found he was "largely absent for most of [the children's] lives." And by his own admission, Scott was not an active parent for most of the last decade. Despite not working, Scott never sought to exercise the full visitation afforded to him by the divorce decree. And he

had virtually no contact with the children for a period of years. Even after they moved back to Iowa, Scott didn't ask the children about where they were living or going to school. And the few occasions Scott provided daily care for the children were rife with problems, including the repetition of racial epithets spoken by Scott, acting out, and bringing a knife to school.

The "placebo" incident mentioned by the majority bears some elaboration, as those circumstances involved Scott forgetting to send the child's medicine to school and attempting to enlist the school nurse to lie to the child and give him fake pills. Though suspect on its own, this interaction takes on a more nefarious patina when you add that Scott told Dawn he "didn't believe" the mental-health diagnosis that required the medication. This is also of a flavor with Scott telling the children that COVID-19 wasn't a real virus and that there was something wrong with the vaccine, which led to the children having panic attacks every time they got a flu shot. So, while the majority vaguely alludes to Scott becoming a better parent over some period of time in the immediate lead-up to trial, I am hardly convinced that a few months of sudden interest in parenting means much. And I place weight on the fact that Scott's "change[ of] heart," as Dawn's mother put it, only came about when he learned the children were beneficiaries of a trust fund.

Scott has never paid a cent of child support. Although he claims to be disabled and unable to work, the federal government disagrees—denying his multiple applications for disability benefits—and Scott offered no medical evidence at trial. He has chosen not to financially support himself at any point over the last decade, instead freeloading off his mother and now his new wife. There is no evidence in the record that Scott has, or ever will have, any financial means by

which he can provide for the children. While married to Dawn, Scott bragged about how he owed another woman $58,000 in back child support and never planned to pay it. He owes Dawn at least $73,000 in child support as of trial, and the closest thing he had to a "plan" for paying this amount was a suggestion that he could do a cash-out refinance of his new wife's house and use some of her (now his) money.

These facts speak for themselves. Scott is not a suitable parent, let alone a superior one to Dawn. In fact, this record would be sufficient to terminate Scott's parental rights. *See* Iowa Code § 600A.8(4) (authorizing termination of parental rights when "[a] parent has been ordered to contribute to the support of the child[ren] . . . and has failed to do so without good cause"); *In re B.L.A.*, 357 N.W.2d 20, 23 (Iowa 1984) (applying this section); *In re B.C.,* No. 24-0680, 2024 WL 4965869, at *3 (Iowa Ct. App. Dec. 4, 2024) ("Making the decision to not provide your child any financial support is not 'good cause.'"). We should all be troubled that facts that could justify termination of parental rights have been spun into a finding of superior parenting. And it is perverse that perhaps Dawn could have avoided losing physical care of the children had she petitioned under chapter 600A to remove Scott from their lives, rather than allowing him visitation and contact to preserve the father–child relationship.

In this procedural posture seeking modification of the custody decree, it was Scott's "heavy" burden to prove he was a superior caretaker compared to Dawn. *See In re Marriage of Frederici*, 338 N.W.2d 156, 158 (Iowa 1983). So, what does the majority consider Dawn's fatal flaws that materially outweigh Scott's deficits? Mostly that Dawn's mother provided a substantial amount of care while Dawn worked out of state during the week. But the majority fails to meaningfully

acknowledge *why* Dawn had to stick with her airline job and now her work for an out-of-state law-enforcement organization. And the answer is that, as a single mother not receiving a penny of child support from Scott, she had to prioritize her career to financially provide for the children. Now, the majority has affirmed placing the children with Scott—who continues to have no plan for financially supporting them—and moved the children from a stable care arrangement in which they were thriving, and in which Dawn and her mother managed all of their educational, medical, and other obligations, to an entirely new home life.

Neither the majority nor the district court have appropriately considered that Dawn's sacrifices to provide for the children were directly caused by Scott's failure to pay any child support. In other words, neither own up to essentially punishing Dawn for maintaining her career to fill the financial gap caused by Scott's deadbeat approach to child support. *See In re Marriage of Brogden*, 344 N.W.2d 271, 273 (Iowa Ct. App. 1983) ("The award of custody cannot be used to punish one parent or reward the other."). Nor have the majority or district court given serious consideration to Dawn's alternative request to move to back to Iowa if the court was unwilling to let her relocate with the children to Philadelphia. My vote is that the children are better off under the care arrangement with Dawn (aided by her mother) than they will be with Scott, regardless of whether Dawn moves with the children or moves back to Iowa. Scott is not a suitable father, and he certainly did not meet his heavy burden to prove he could provide superior care. I dissent.