**IN THE COURT OF APPEALS OF IOWA**

No. 14-1348
Filed May 11, 2016

IN RE THE MARRIAGE OF DONALD L. SEALS
AND JACQUELYN F. MIHM SEALS

Upon the Petition of
DONALD L. SEALS,
          Petitioner-Appellant,

And Concerning
JACQUELYN F. MIHM SEALS,
          Respondent-Appellee.
_____

          Appeal from the Iowa District Court for Linn County, Robert E. Sosalla,

Judge.


          Donald Seals appeals the economic provisions of the district court's

decree dissolving his marriage. **AFFIRMED.**



          Anne M. Laverty of Mullin & Laverty, L.C., Cedar Rapids, for appellant.

          Joseph G. Bertroche Jr. of Bertroche Law Office, Cedar Rapids, for

appellee.



          Considered by Danilson, C.J., and Mullins and McDonald, JJ.

**MULLINS, Judge.**

Donald Seals appeals the economic provisions of the district court's decree dissolving his marriage to Jacquelyn Mihm Seals, as amended by the court's subsequent ruling regarding the parties' posttrial motions. Don contends the district court erred in (1) valuing Jackie's 401(k) at the time of separation instead of at the time of trial; (2) calculating child support by imputing income to him; and (3) failing to award him attorney fees after Jackie backed out of a proposed settlement agreement. Jackie requests appellate attorney fees. Upon our de novo review of the record, we affirm.

## I.    Background Facts and Proceedings

Don and Jackie were married in October 1986. The parties have two minor children. Don is fifty-eight years old and in good health. Don has completed some college and has held numerous part-time, short-term, and self-employed jobs—including a managerial position at Rockwell Collins, a stint as a real estate agent, and a manager of a Mr. Movies franchise he and Jackie co-owned with other investors. At the time of trial, Don was working full time for a temporary agency, earning $11 per hour or approximately $22,880 annually. During most of the pendency of the dissolution action, Don was not employed and he used the parties' savings and rental income to cover his living expenses. Don explained his lack of employment by stating he was waiting for the dissolution to be settled so he could return to managing the parties' rental properties. Jackie is fifty-six years old and in good health. Jackie has a college

degree in biology and has worked for Rockwell Collins for over thirty years. At the time of trial, Jackie had an annual gross salary of approximately $114,537.

The parties have engaged in several business ventures throughout their marriage. In 1992, Don and Jackie invested in a Mr. Movies franchise in Clinton. Don managed the business on a daily basis, and Jackie assisted on weekends. The franchise was successful and the parties eventually sold the franchise back to the parent company. Don received $152,817 in company stock from the sale, which the company bought back in cash payments over time. The company also offered Don a full-time position, which would have required the parties to move, but Don declined and instead accepted a two-year contract for a position as a marketing consultant.

In 1994, the parties invested in a car wash in Anamosa. Over the years, the parties also invested in real estate rental properties, purchasing modest homes in their own neighborhood, a home in Davenport that the parties rented to Don's sister and her family, a commercial building that housed the Mr. Movies franchise on North 3rd Street in Clinton, and a mixed commercial/residential property on Camanche Avenue in Clinton. At one time, Don and Jackie owned as many as ten rental units, including both residential and commercial properties. The parties operated the rental business together; Don managed the properties and Jackie performed most of the cleaning, repair, and maintenance work. At the time of trial, the parties owned their marital home—where Jackie and the children lived, a rental home in Davenport, five rental homes in Cedar Rapids,

and the Camanche Avenue property in Clinton.[1] Nationwide Mortgage held a first and second mortgage on the marital home. U.S. Bank held the mortgage on the Davenport house. Farmers State Bank held three mortgages on the other six properties, with the properties all cross-collateralized under the mortgages, for a loan total of $339,175.17.

After the parties separated, Jackie became solely responsible for making loan payments for the marital home, and the parties struggled to co-manage the rentals and bank loans.[2] At the time of trial, only two of the rental properties were tenant-occupied. Don was also residing in one of the rental homes in Cedar Rapids but was not paying rent or making payments toward the mortgage loan in lieu of rent. Both parties had liquidated cash investments and savings to make the mortgage payments for the large loan at Farmers State Bank but were still in arrears and the bank had threatened foreclosure.

The parties also accumulated substantial retirement savings throughout their twenty-seven-year marriage. Jackie held a pension and two 401(k) accounts with her employer, Rockwell Collins. At the time of trial, Jackie's Rockwell Collins Salaried Retirement Savings Plan (Salaried RSP) was valued at $579,584.23[3] and her Rockwell Collins Automation Retirement Savings Plan

---

[1] The parties held the marital home and the Davenport rental home in joint tenancy. Jackie held title to all five of the Cedar Rapids rental homes. Global Holdings L.L.C., owned by Don, held title to the Camanche Avenue property in Clinton. For the purposes of trial, however, the parties and the court treated all real estate as marital property.

[2] We note Don retained exclusive control of the management of and any monies generated by the Davenport property rented to his family members and the Camanche Avenue property in Clinton.

[3] In its ruling on the parties' Iowa Rule of Civil Procedure 1.904(2) motions, the court found $579,584.23 was the Salaried RSP's total value. After the court adjusted the

(Automation RSP) was valued at $421,054.18. The parties also had various IRAs and cash investment accounts.[4] For purposes of trial, the parties agreed all of their retirement money and cash investments were earned during the marriage.

Don and Jackie separated in January 2010. Don filed a petition for dissolution of marriage in November 2010. In June 2011, the district court ordered Don to pay temporary child support to Jackie for their two minor children.[5] The parties were initially scheduled for trial in August 2012. A few days before the scheduled trial date, the parties reached an oral agreement for settlement, which Jackie subsequently rescinded, and the trial was continued.[6] Later that month, Don filed a motion to enforce the settlement agreement. The district court denied Don's motion, concluding it would be unfair and inequitable to enforce the settlement agreement because the property settlement could not be implemented.

---

value for the marital debt portion of the loans against the plan (total $42,062.03—$35,062.03 of which was marital debt and $7000 of which was nonmarital debt owed by Jackie) and set aside the contributions Jackie and her employer had made to the plan from January 2010 until January 2014 ($73,282.30), the court reached a value of $506,301.93 to be equitably divided between the parties.

[4] Jackie also held two Roth IRAs with a total value of $17,941.73. Don held two Roth IRAs with a total value of $11,439.96, a Simple IRA valued at $3567.55, a Rollover IRA valued at $74,474.26, and an employee stock ownership plan valued at $100. The parties also held, individually or jointly, several investment and banking accounts with a total value of $27,060.25.

[5] Prior to entry of the temporary order, Don had not paid any child support to Jackie for the care of their children. Following entry of the temporary support order, Don was delinquent in paying child support to Jackie although he was capable of paying. Don was current with child support payments at the time of trial.

[6] Under the agreement, each party would receive four properties. The receiving party was to refinance the property and remove the other party from liability for any mortgage and loan for the received property.

The matter came on for trial on January 7–8, 2014. With regard to the parties' retirement and cash investment accounts, Don requested the court value the accounts as of the date of trial. Jackie agreed the valuation of the accounts should be as of the date of trial but asserted the court should set aside from the property division the contributions she made to her Salaried RSP between the time of the parties' separation and trial.[7] She argued Don had been intentionally unemployed or underemployed since the time of their separation in January 2010 and it would not be equitable for Don to receive a share of the contributions she had paid from her salary and received from her employer.

The district court entered a decree dissolving the parties' marriage on May 9, 2014. Pursuant to the parties' wishes, the court awarded the parties joint legal custody of their two minor children and physical custody to Jackie. Also by agreement of the parties, the court awarded the Davenport rental house—which had a mortgage and loan separate from the other rental properties—to Don, and the marital home to Jackie, both subject to refinancing of the respective mortgage loans. The court ordered all other rental properties be sold and any net proceeds divided equally between the parties. The court further stated that if Don continued to live in one of the rental homes prior to its sale, he must pay rent in the amount of $900 per month.[8]

---

[7] Between January 2010—the date recognized by the district court as the date when the parties separated—and the date of trial, Jackie made contributions to her retirement plans in the amount of $73,282.30.

[8] Don and Jackie both testified the rental home Don was residing in could bring rent in the amount of $900 to $1100 per month.

With regard to the division of the parties' retirement accounts, the court distributed to Jackie the accounts in her name and to Don the accounts in his name. The court also allocated the banking and cash investment accounts between the parties. Ultimately, the court ordered Jackie to pay Don a property equalization payment in the amount of $386,181.10 pursuant to a Qualified Domestic Relations Order (QDRO) to be paid out of, at Jackie's election, either her Salaried RSP or her Automation RSP. The court also ordered Jackie be responsible for paying the outstanding loans against her Salaried RSP but allowed her a credit in the property distribution, finding the loans constituted a marital debt.

Additionally, the court found Don was "under employed considering his educational background and experience," imputed an annual income to Don in the amount of $31,200, and ordered Don to pay child support to Jackie in the amount of $490 per month. The court also denied Don's request for a portion of his attorney fees incurred after Jackie rescinded her agreement to the August 2012 settlement offer, ordered each party to be responsible for his or her own attorney fees, and required Don to pay all court costs.

Both parties filed motions to enlarge or amend the court's findings and conclusions pursuant to rule 1.904(2). In its ruling on the parties' motions, the court recalculated the amounts and fair distribution of two loans Jackie had taken against her Salaried RSP account in late 2013 to pay marital debts and attorney fees. The court concluded Jackie had used $7000 for attorney fees and $35,062.03 for marital expenses. The court held Jackie should be responsible

for the repayment of the loans, but credited her with $35,062.03 in the property distribution.[9] Additionally, the court reconsidered its findings with regards to Jackie's Salaried RSP account and noted Jackie had not asked the court to value her Salaried RSP retirement account as of the date of separation, but rather had asked the court to carve out her and her employer's contributions to the account from the time of the parties' separation until the date of trial four years later. The court concluded an equitable division of Jackie's Salaried RSP would allow Jackie to retain her contributions to the plan, while Don would retain the benefit of any increased value resulting from "market forces." Thus, the court valued the Salaried RSP at $537,522.20, plus the value of the loans taken against the plan in the amount of $42,062.03, and subtracted Jackie's and her employer's contributions to the plan made over the four-year period in the amount of $73,282.30, to reach the amount subject to the property distribution: $506,301.93. The court also amended the decree to provide that, pursuant to the parties' stipulation, Jackie's Automation RSP valued at $421,396.68 would be divided according to the percentage method established in *In re Marriage of Benson*, 545 N.W.2d 252, 255 (Iowa 1996). The court ordered Jackie to make a

---

[9] The court also amended the decree to note that Don had sold the North 3rd Street commercial property in Clinton for a net $52,219 in March 2013. The court rejected Jackie's argument that Don had dissipated assets and found Don had used $14,183.12 from the sale to pay for his living expenses, i.e., marital expenses, and $25,000 to pay his attorney fees, i.e., nonmarital expenses. At the time of trial, Don had $13,035.88 left from the sale of the property and had not shared any of the proceeds with Jackie. The court found these remaining funds were subject to the property division. Further, the court agreed with Don's argument that it had incorrectly mingled real and personal property with retirement accounts to determine an equalization amount. Consequently, the court ordered Don to make a cash property equalization payment to Jackie in the amount of $7160.81.

payment to Don for a total sum of $410,548.27, to be paid through a QDRO from either of her RSPs at her election.

Don appeals.

## II.    Standard of Review

We review cases tried in equity, such as dissolution cases, de novo.  Iowa R. App. P. 6.907; *In re Marriage of Gust*, 858 N.W.2d 402, 406 (Iowa 2015).  We give weight to the factual findings of the district court, especially when considering the credibility of witnesses, but we are not bound by them.  Iowa R. App. P. 6.904(3)(g).  Prior cases, though helpful, have little precedential value because we must base our decision primarily on the particular circumstances of the parties presently before us.  *In re Marriage of Weidner*, 338 N.W.2d 351, 356 (Iowa 1983).  We accord the trial court considerable latitude in making factual determinations and will disturb the ruling only when there has been a failure to do equity.  *In re Gust*, 858 N.W.2d at 406.

## III.    Analysis

Don contends the district court should have valued all assets as of the date of trial and the district court erred in setting aside to Jackie the contributions she and her employer made to her Salaried RSP.  He also claims the court incorrectly calculated his child support obligation when it imputed income to him based on his earning capacity instead of calculating his child support obligation based on his actual income.  Finally, Don complains the district court should have ordered Jackie to pay a portion of his attorney fees he incurred after she rescinded her agreement to a proposed settlement offer in August 2012.

*A. Property Distribution*

In matters of property distribution, we are guided by Iowa Code section 598.21 (2013). The parties in a dissolution action "are entitled to a just and equitable share of the property accumulated through their joint efforts." *In re Marriage of O'Rourke*, 547 N.W.2d 864, 865 (Iowa Ct. App. 1996). Iowa law does not require an equal division, but rather, "what is fair and equitable in each circumstance." *In re Marriage of Campbell*, 623 N.W.2d 585, 586 (Iowa Ct. App. 2001). We will defer to the trial court's valuations when supported by credibility findings or corroborating evidence, though our review is still de novo. *In re Marriage of Hansen*, 733 N.W.2d 683, 703 (Iowa 2007). Generally, "[t]he value of the assets . . . should be determined as of the date of trial"; however, "[t]here may be occasions when the trial date is not appropriate to determine values." *In re Marriage of Driscoll*, 563 N.W.2d 640, 642 (Iowa Ct. App. 1997). "Equitable distributions require flexibility and concrete rules of distribution may frustrate the court's goal of obtaining equitable results." *Id.* Thus, "it is inherent in the court's equitable powers, to make appropriate adjustments, according to the unique facts of each case." *Id.*

Don contends the district court should have valued all assets as of the date of trial instead of setting aside to Jackie the contributions she made to her Salaried RSP between the date of the parties' separation in January 2010 and the date of trial in January 2014. He contends he should receive the property equalization payment in the amount of $410,548.27 ordered by the court in its ruling on the parties' rule 1.904(2) motions, plus one-half of Jackie's and her

employer's contributions to her Salaried RSP ($73,282.30), for a total retirement property equalization payment of $447,189.42. In its ruling, the court noted Jackie did not request that her plan be valued as of the date of separation, but rather, as of the date of trial; Jackie maintains this argument on appeal. She contends the court correctly concluded an equitable division would allow her to retain her contributions to her Salaried RSP, while Don would retain the benefit of any increased value to the plan resulting from "market forces."[10] She complains Don did not obtain employment during the first three and one-half years following the parties' separation, and when he did gain employment six months before trial, he was underemployed. She also asserts he did not contribute to the financial needs of the family for extended periods of time and did not set aside any funds for retirement from their separation until trial, all while he was living rent-free in one of the parties' rental properties.

In *In re Campbell*, neither party made contributions to any retirement accounts between the time of separation and the date of trial, and the trial court declined to use the date of separation to value the retirement account at issue and allow "the party who control[led] the asset . . . to solely reap the benefit of the increase in value" during the period of the parties' separation. 623 N.W.2d at 588 (declining to use of the date of separation to value a party's retirement account when the party "did not make any additional contributions to that account from the date of separation to the date of trial," and any increased "value of the

_____

[10] We note that although Don did not receive a portion of Jackie's salary and employer-matched benefits contributions under the district court's amended decree, he did receive the market increase on those contributions.

account was strictly fortuitous"). In this case, Jackie continued to make additional, significant contributions toward her Salaried RSP account over the four-year period between the date of separation and the date of trial. The record shows that in January 2010, Jackie's Salaried RSP had a value of $235,204.72. At trial, the court valued Jackie's Salaried RSP at $579,584.23. It was from this valuation as of the date of trial that the court subtracted Jackie's contributions to the plan made from January 2010 until January 2014 in the amount of $73,282.30, and determined $506,301.93 was subject to the property distribution. It is clear the district court did not "distribute[] property based on separation date values merely because [Don] did not contribute to the growth of [the] asset prior to trial." *See id.* (overruling our decision in *In re Marriage of Oakes*, 462 N.W.2d 730, 733 (Iowa Ct. App. 1990)). Rather, the district court valued the retirement account as of the date of trial, carved out the significant contributions Jackie had made from her salary and her employer-matched benefits since Don had left the marital home, and allocated half of the remainder to each of the parties.[11]

Based upon our de novo review of the record, we conclude the district court equitably distributed the parties' retirement accounts and affirm.

*B. Child Support*

Don contends the district court incorrectly imputed income to him in calculating his child support obligation rather than using his actual income for the calculation. In applying the child support guidelines, the court must determine the parents' monthly income from the most reliable evidence presented. *In re*

---

[11] The remainder included all growth from market forces, including growth on the contributions from Jackie and her employer.

*Marriage of Powell*, 474 N.W.2d 531, 534 (Iowa 1991). At the time of trial, Don was working full time for a temporary employment agency earning $11 per hour or $22,880 per year.

"Both parents have a legal obligation to support their children, not necessarily equally but in accordance with his or her ability to pay." *Moore v. Kriegel*, 551 N.W.2d 887, 889 (Iowa Ct. App. 1996). There is "a rebuttable presumption that the amount of child support which would result from the application of the guidelines prescribed by the supreme court is the correct amount of child support to be awarded." Iowa Ct. R. 9.4. However, the obligation "may be adjusted upward or downward . . . if the court finds such adjustment necessary to provide for the needs of the children or to do justice between the parties under the special circumstances of the case," *id.*, as long as the court makes "a written finding that the guidelines would be unjust or inappropriate" under specified criteria, Iowa Ct. R. 9.11. "When a parent voluntarily reduces his or her income or decides not to work, it may be appropriate for the court to consider earning capacity rather than actual earnings when applying the child support guidelines." *In re Marriage of Nelson*, 570 N.W.2d 103, 106 (Iowa 1997). In making this determination, "[w]e examine the employment history, present earnings, and reasons for failing to work a regular work week." *Id.*

The district court made these findings which are helpful to our analysis:

> Donald currently earns $11.00 an hour. He works a [forty-] hour week. Donald has demonstrated historically that he is capable of earning much more. He has run successful businesses. He has had gainful employment at such companies as Proctor and Gamble

and Rockwell Collins. He has assisted in managing the parties' rental business. He has earned a realtor's license and worked as a realtor. Though Jackie has consistently been the family's primary breadwinner, Donald has been able to contribute to the family finances at a rate greater than $11.00 an hour. By all appearances, Donald is underemployed considering his educational background and experience.

The district court concluded, "if I used Donald's actual earnings, substantial injustice would occur or other adjustments would be necessary to provide for the children and do justice between the parties." The court noted the parties' children had special needs and thus the parents "incur[red] greater than average medical and child care costs warranting the deviation from the child support guidelines." The court also examined Jackie's cost for health benefits for the children at $852 a year, discussed her $7500 deductible before her healthcare coverage applied, and noted "[s]he also pays $5,880.00 a year in after school and summer daycare costs." Based on its findings, the court imputed an income to Don in the amount of $15 per hour,[12] or $31,200 per year, and ordered Don to pay child support to Jackie in the amount of $490 per month.

Upon our de novo review, we agree with the district court a substantial injustice would result to Jackie and the children if Don's actual earnings were used to determine his child support obligation, rather than imputing his earning capacity, and affirm.

---

[12] The district court's decree included this footnote: "I believe this is being generous to Donald. He has the proven ability to earn much more than $15.00 an hour."

*C. Attorney Fees*

1. Trial Attorney Fees

"Ordinarily an award of attorney's fees rests in the sound discretion of the trial court and will not be disturbed on appeal in the absence of an abuse of discretion." *In re Marriage of Wessels*, 542 N.W.2d 486, 491 (Iowa 1995). "[A]n award of attorney's fees depends upon the ability of the respective parties to pay, depending upon the financial circumstances and earnings of each[]." *Id.*

In denying Don's request for a portion of his attorney fees as a result of Jackie rescinding her agreement to the August 2012 settlement proposal, the court noted in its ruling on the parties' rule 1.904(2) motions that it had previously denied Don's motion to enforce the settlement agreement and determined the agreement was inequitable and unfair because it was "impossible to perform under the circumstances." Thus, the court found it had "previously absolved Jackie of the obligation to follow through with the settlement agreement" and there was "no basis to assess a portion of Donald's attorney fees to her." We find no abuse of discretion here and affirm the district court's denial of an award of attorney fees to Don.

2. Appellate Attorney Fees

Jackie requests appellate attorney fees. "Appellate attorney fees are not a matter of right, but rather rest in this court's sole discretion." *In re Marriage of Okland*, 699 N.W.2d 260, 270 (Iowa 2005). In determining whether to award attorney fees, we consider "the needs of the party seeking the award, the ability of the other party to pay, and the relative merits of the appeal." *Id.* Although

Jackie successfully defended the district court's decision on appeal, after considering the relative financial positions of the parties in this case, we decline to award Jackie appellate attorney fees.

**AFFIRMED.**