**In re the MARRIAGE OF Marvin A. WEIDNER and Betsy F. Weidner**

**Upon the Petition of Marvin A. Weidner, Appellant,**

**and concerning Betsy F. Weidner, Appellee.**

**No. 69526.**

Supreme Court of Iowa.

Sept. 21, 1983.

352

Harvey L. Harrison, Des Moines, for appellant.

Tom W. George, Des Moines, for appellee.

John P. Dollar, Des Moines, for the amicus curiae Parents Without Partners, Inc.

Considered by REYNOLDSON, C.J., and UHLENHOPP, McGIVERIN, LARSON and WOLLE, JJ.

WOLLE, Justice.

Appellant Marvin Weidner (Marvin) appeals from several provisions of a dissolution decree under which appellee Betsy Weidner (Betsy) was granted sole custody of the parties' two children. The principal issue is whether the court should have provided for joint custody as requested by Marvin. Marvin also contends that if joint custody was not appropriate then he, rather than Betsy, should have received custody of the children. We first address the issue of child custody, then the economic and other issues raised by the parties.

Marvin and Betsy Weidner were married on August 29, 1970, and two children were born of the marriage, Elizabeth (Libby) born on December 18, 1971 and Seth born on December 27, 1974. After Marvin and Betsy graduated from Iowa Wesleyan College in 1972, Marvin received his degree in theology from Garrett Theological Seminary in Evanston, Illinois. Marvin then served Methodist churches in Humboldt, Iowa until 1975 and Burlington, Iowa until 1977, when the parties moved to Des Moines. Marvin is now Director of the Iowa Refugee Service Center. Betsy obtained a teaching certificate in college, but she did not work outside the home on a full time basis until the parties moved to Des Moines. She has had several part time jobs and now is employed full time as an office receptionist in a Des Moines department store.

As early as 1975, disagreements between Marvin and Betsy caused them to live apart for one week. More serious difficulties later arose. Marvin moved out of the family home between June and November of 1980, and after living together for nine more months the parties separated permanently in August of 1981. During the sixteen months between the final separation and the entry of the court's decree Betsy was the primary physical custodian of the children, but Marvin was with them almost half the time. In general Betsy was the person who took care of the children's day-to-day activities, such as getting them ready for school, packing lunches, doing laundry, and taking care of them while they were ill. Marvin was with the children every weekend and one other day each week; he also maintained daily contact with the children both by personal visits to the home and through phone calls. Even though both parties spent equivalent amounts of time with the children, by the time of their final separation the parties neither trusted each other nor enjoyed being in each other's company. The friction which this lack of trust and frequent contact created was exacerbated by Marvin's friendship with a woman friend with whom he often spent considerable time while he had physical custody of the children.

Considering these and other circumstances hereafter discussed we must decide if the trial court properly placed Libby and Seth in the custody of Betsy subject to specified periods of visitation for Marvin rather than providing in the decree for joint custody or sole custody in Marvin.

I. *Principles Governing Joint Custody—Background.* The primary issue in this case is whether the trial court should have provided for joint custody rather than awarding custody to Betsy. Until recently, the principles governing joint custody awards were those set forth in *In Re Marriage of*

*Burham,* 283 N.W.2d 269 (Iowa 1979). The *Burham* opinion explained the background and meaning of joint custody and divided custody, then articulated principles for deciding when joint custody is appropriate. The then existing statutory language did not provide clear guidelines; all the statute said was, "The court may provide for joint custody of the children by the parties." Iowa Code § 598.21(6) (1979).

Effective July 1, 1982, section 598.21(6) was changed to make joint custody awards subject to the more explicit statutory guidelines which are now codified in section 598.-41. *See* 69th G.A. ch. 1250 (1982); Iowa Code §§ 598.21(6) and 598.41 (1983). Our very recent case of *In Re Marriage of Bolin,* 336 N.W.2d 441 (Iowa 1983), though distinguishable as involving modification rather than initial entry of a dissolution decree, does carefully explain the changes in joint custody considerations brought about by the 1982 statutory change. In *Bolin* we said:

> The 1982 amendment shows, however, that joint custody does not require alternating custodial companionship. Joint custody is not synonymous with what this court previously labeled 'divided custody.' *See McCrery v. McCrery,* 258 Iowa 354, 138 N.W.2d 876 (1965). In light of the uncertainty of meaning noted in *Burham,* we believe the General Assembly added the 1982 definitions to clarify rather than to change the meaning of the statute. *See Barnett v. Durant Community School District,* 249 N.W.2d 626, 629 (Iowa 1977). In this case we therefore give the term joint custody its present statutory meaning.

336 N.W.2d at 444.

Iowa Code section 598.41 (1983) provides in pertinent part as follows:

> Custody of children.
>
> 1. The court, insofar as is reasonable and in the best interest of the child, shall order the custody award, including liberal visitation rights where appropriate, which will assure a minor child frequent and continuing contact with both parents after the parents have separated or dissolved the marriage, and which will en-courage parents to share the rights and responsibilities of raising the child. Unless otherwise ordered by the court in the custody decree, both parents shall have legal access to information concerning the child, including but not limited to medical, educational and law enforcement records.
>
> 2. On the application of either parent, the court shall consider granting joint custody in cases where the parents do not agree to joint custody. If the court does not grant joint custody under this subsection, the court shall state in its decision the reasons for denying joint custody. Before ruling upon the joint custody petition in these cases, the court may require the parties to participate in custody mediation counseling to determine whether joint custody is in the best interest of the child. The court may require the child's participation in the mediation counseling insofar as the court determines the child's participation is advisable.
>
> The costs of custody mediation counseling shall be paid in full or in part by the parties and taxed as court costs.
>
> 3. In considering what custody arrangement under either subsection 1 or 2 is in the best interests of the minor child, the court shall consider the following factors:
>
>    *a.* Whether each parent would be a suitable custodian for the child.
>
>    *b.* Whether the psychological and emotional needs and development of the child will suffer due to lack of active contact with and attention from both parties.
>
>    *c.* Whether the parents can communicate with each other regarding the child's needs.
>
>    *d.* Whether both parents have actively cared for the child before and since the separation.
>
>    *e.* Whether each parent can support the other parent's relationship with the child.
>
>    *f.* Whether the custody arrangement is in accord with the child's wishes or whether the child has strong opposition,

taking into consideration the child's age and maturity.

    *g.* Whether one or both the parents agree or are opposed to joint custody.

    *h.* The geographic proximity of the parents.

    4. Joint legal custody does not require joint physical care. When the court determines such action would be in the child's best interest, physical care may be given to one joint custodial parent and not to the other. However, physical care given to one parent does not affect the other parent's rights and responsibilities as a legal custodian of the child.

    ■ It may be instructive to note that this statutory language which encourages courts to consider and grant joint custody was enacted within a few months after publication of *In Re Marriage of Castle,* 312 N.W.2d 147 (Iowa Ct.App.1981). There the Iowa Court of Appeals in a three to two decision denied a request for joint custody primarily on the ground that our *Burham* decision seemed to allow one party to veto joint custody by expressing disapproval of such arrangements. The specially concurring judges in *Castle* suggested that the law should presume joint custody to be in the best interests of children. In enacting section 598.41 the legislature did not use the word presumption and we find no such presumption in Iowa law. Clearly, however, our statutes now express a preference for joint custody over other custodial arrangements and do not allow one-party vetoes. One parent's opposition to joint custody is only one of the several factors which the court must consider when the other parent has requested joint custody.

    ■ These new principles governing joint custody, and the specific listed factors which are to be considered when a parent requests joint custody, are the bench marks by which our courts are to determine whether joint custody is in the best interest of children of dissolved marriages. Applying them we now must determine whether under the evidence here joint custody should have been granted as being in the best interests of the Weidner children Libby and Seth.

    ■ II. *Is Joint Custody Appropriate in This Case?* Our review is de novo; we give weight to the findings of the trial court, especially those concerning credibility of witnesses, but are not bound by them. Iowa R.App.P. 4, 14(f)(7). Prior cases have little precedential value; we must base our decision primarily on the particular circumstances of the parties in this case. *In Re Marriage of Kehrli,* 241 N.W.2d 923, 926 (Iowa 1976). Our first and foremost consideration in determining custody is the best interest of the child involved. Iowa R.App.P. 14(f)(15).

The trial court's findings of fact demonstrate that before awarding Betsy sole custody of the children, the court carefully considered Marvin's request for joint custody. The court said:

    While this case was awaiting trial, the parties attempted to have the children with each parent approximately one-half of the time. Originally the children, even during the school year, were with the petitioner from Tuesday morning until Wednesday morning of each week and from Friday morning until Sunday night of each week. When the children returned to the custody of the respondent, they were tired, somewhat crabby and did not want the fun they had been having (while with petitioner) to stop. It was difficult for the respondent and for the children, for the children to get back into the routine of going to school.

    On a number of occasions an argument arose over who was going to have the children at a particular time. On one of these occasions when the respondent had the children with her in her car, the petitioner came upon them while he was in his car. The respondent drove into a driveway at a fire station and petitioner did, too. The police were called and arrived upon the scene. No court order was in effect at the time as to who was to have the children, and the officer would not intercede except to keep the peace. Following this incident a court order was

entered giving respondent temporary custody and the petitioner visitation for the times he previously had the children with him, except that the weekend visitation ended on Sunday morning.

The court after a consideration of all the evidence finds that joint custody should not be granted in this case. While the parties are both fit and suitable to act as a custodial parent, they have not demonstrated that they are able to communicate and give priority to the welfare of the children by reaching shared decisions that are in the best interests of the children.

The trial court also highlighted certain other matters in its findings of fact, providing us further insight into why it decided against joint custody. The findings of fact emphasize the complication in the lives of Marvin and the children caused by the presence of his woman friend. According to the trial court's findings, Marvin and she "had had an open, ongoing, intimate relationship for about a year." The trial court indicated this relationship had been a serious concern of the court-appointed family therapist who had based his recommendation of joint custody in part upon recommending minimal involvement of other adults in the relationship between the parents and their children. The trial court found that Marvin used poor judgment in discussing frightening ideas, such as a nuclear holocaust, with the children shortly before returning them to Betsy. It expressed concern about the petitioner's discussions with the children concerning his relationship with his woman friend and other matters pertaining to the dissolution case which caused them anxiety.

■ There is solid support in the record for each and all of the trial court's findings of fact and expressions of concern about the feasibility of joint custody for these particular parents. The court not only commented on the parties' general inability to communicate and reach shared child-raising decisions, but also focused upon specific unpleasant scenes from the failing marriage when the parties' dislike and mistrust of each other was made painfully clear to the children. Such incidents seem truly to have wreaked havoc in the lives of the parents and, more importantly, the day-to-day lives of their children. We need not further encumber these printed pages with the details of each unpleasant event which followed the final separation of Marvin and Betsy. Suffice it to say that neither party seems now to respect the other. Neither parent has been able to function well except when completely separated from the other. For example, Marvin's repeated efforts to speak with and visit the children on occasions when they have been in the physical care of Betsy have been stressful for Betsy and the children. Marvin's tape recording of some of his phone conversations with Betsy is symptomatic of the extent to which the parents dislike each other. This attempt by Marvin to obtain evidence for trial led Betsy to communicate with him exclusively through written notes.

We are here primarily concerned not with the effect upon Marvin and Betsy of this regular pattern of highly unpleasant episodes, but rather with the adverse effect upon Libby and Seth, their children. This is reflected not only in the parties' testimony but also in the written report and testimony of the court-appointed therapist who performed testing, interviewed the family members on several occasions, and then provided recommendations to the court. Marvin relied heavily on the therapist's recommendation of joint custody, but we find much in the report which seems inconsistent with that recommendation. His first recommendation was

> That joint custody be reconsidered for the children's sake, if both Betsy and Marvin are willing to work toward its success ... and if Marvin and Betsy each follow recommendations listed below for extensive therapy. Without compliance joint custody does not appear a promising alternative.

The recommendation included 10 to 12 months of post-decree therapeutic work. He indicated this was needed for several reasons; these reasons themselves reflect how serious had been the strife created by the parents and thrust upon the children.

He reported that neither child had truly accepted or understood the parent's bitterness and sense of failure. It appears the post-separation period of living first with one parent and then the other was confusing to both children. The older child Libby (then "an intelligent, sensitive young girl of 10") was reported by the therapist as "trapped in a loyalty conflict", feeling herself to be a comforter for both parents and responsible for the hurt that might result from either parent's loss of custody. The family therapist was also "concerned about Seth's adjustment" during the period of parental separation. He reported that the children both "have already endured a sense of rootlessness in their development, with the family moves and continued uncertainty of their parents' marriage." He opined also that the children "need frequent time alone with each parent, without the regular involvement of other adults being present with the parent—even other relatives." On cross examination he explained that the "grieving process" needed for repairing and understanding emotional scars of the bad marriage was still in process for the parents and had not even started for these two young children—"they're denying how much disruption is going on." He attributed this in part to the entry of Marvin's woman friend into this situation. In this regard he stated:

> But again, in light of the whole thing of restructuring their primary contacts and their emotional bonds with each individual parent, it's going to be imperative that they have as much time as they want, not as much time as the individual parent wants, to have alone with that natural parent, be that their father or their mother.

It is reasonable to conclude from his testimony that a joint custody arrangement probably would not work unless the parties both would change their recent pattern of behavior, believe in the positive effects of such an arrangement, and respond satisfactorily to about a year of active post-marital counseling and therapy. We agree with the trial court in concluding that those pre-conditions to successful joint custody arrangements are unlikely to be satisfactorily met, based on the parties' demonstrated antagonism toward each other since the marriage failed.

We would be remiss if we did not mention and correct certain misconceptions counsel and trial courts may have concerning joint custody. None of the eight factors which judges must weigh in the balance are conditions precedent to a joint custody determination. The trial court should consider and express itself in writing on those factors among the eight listed which are pertinent in disputed cases, but there is no magic number of the factors which, when satisfied, will mandate a decision for or against joint custody. The quality of the total family custodial setting rather than a given quantity of the listed factors should be determinative on the issue of joint custody. Here, no factor alone has dissuaded us from putting in place a joint custody arrangement. We have concluded, however, that on the record in this case Marvin and Betsy would be unable adequately to communicate with each other regarding their children's needs, neither parent would be adequately supportive of the other parent's relationship with the children, and Betsy is opposed to joint custody for reasons reasonably attributable in substantial part to the actions and attitude of Marvin.

Furthermore, no parent and no attorney representing a party should be concerned that a request for joint custody is a sign of weakness, a suggestion to the court that if joint custody is not decreed the party opposing joint custody may have an edge in obtaining sole custody. Conversely, and as was noted in our recent *Bolin* decision, a court may properly consider that a parent's unreasonable or obdurate resistance to joint custody is a factor which can weigh in favor of awarding sole custody to the other parent. *In re Marriage of Bolin*, 336 N.W.2d at 446.

In the last analysis, the custodial determination must reflect and accomplish whatever is in the best interest of the affected

children. Joint custody is preferred because, properly tailored to the parties' circumstances, joint custodial arrangements will often go a long way toward encouraging both parents to share the rights, responsibilities, and frequently joyful and meaningful experiences of raising their children.

We reluctantly but firmly conclude, as did the trial court, that the circumstances here are not conducive to a workable joint custody arrangement which would be in the best interests of the parties' children Libby and Seth.

III. *Sole Custody and Visitation.* Having determined that joint custody is factually inappropriate in this case, we turn to Marvin's alternate contention that he rather than Betsy should have been awarded custody and, in any event, that he was entitled to more extensive visitation.

■ With both parents shown by the evidence to be fit and proper persons to have sole custody, we must decide in whose custody the long-range best interests of the children will be better served. *In Re Marriage of Burham,* 283 N.W.2d 269, 275 (Iowa 1979); *In Re Marriage of Winter,* 223 N.W.2d 165, 166–67 (Iowa 1974).

■ Although the issue is close, we concur in the trial court's decision that Betsy should be the sole custodian. The children have been physically in her custody more frequently than in Marvin's and she has maintained a good home for them under sorely trying circumstances, providing most of their day-to-day supervision and physical care. We also give weight to the recommendation of the family therapist who made sole custody for Betsy his second choice after the qualified recommendation of joint custody which we have declined to follow. Marvin contends that Betsy should be denied sole custody because she has at times resisted his efforts to have regular contacts with the children and may hereafter deprive him of scheduled visitation and appropriate contact with the children. Betsy and Marvin, however, gave conflicting testimony as to what happened on those occasions when Marvin asserts that Betsy

was unreasonable, and the trial court seems to have credited her testimony rather than his. On our de novo review, we conclude that more often than not Betsy was justified in her actions. For example, when she attempted to take the children to Illinois to visit her sister for several days, during one of the emotionally-charged periods of marital strife which was especially hard on the children, it was unreasonable for Marvin to try to talk with the children on the phone every day, sometimes more than once each day knowing how this might upset Betsy and the children.

■ We also agree with the trial court's determination as to Marvin's visitation rights. Visitation every other week from Friday afternoon to Sunday evening provides Marvin regular opportunities to be with the children both day and night while allowing Betsy to spend alternate weekends with the children, a major improvement over the previous arrangement. Before the decree was entered Betsy was only with the children during week days and had little free time to spend with them. The person with primary physical custody is entitled to be more than a servant to the children, entitled to enjoy weekend time with them.

■ We also find the decree fairly apportioned between the parents the time they would be with the children during summer vacations and on holidays. Marvin requests that during summer vacation he have not four weeks visitation but alternating two week intervals throughout the summer. We believe such an arrangement would be confusing and upsetting to the children and would deprive them of the stability which they need at this stage of their development.

We therefore affirm the trial court's decree with respect to all provisions concerning custody and visitation.

IV. *Economic Provisions of the Decree.* Marvin contends that the trial court included in its decree an unreasonable provision concerning insurance. He also challenges the trial court's division of the parties' personal property.

A. Life Insurance. At the time of the dissolution decree Marvin was the owner of a $185,000 life insurance policy, and the trial court decreed that he either maintain that policy in force or provide equivalent life insurance protection in the sum of $100,000 for Betsy and the children. That provision in the decree was intended to provide substantial financial security for Betsy and the children until the children are no longer financially dependent upon their parents. The provision must be viewed in the light of all other economic provisions of the decree including the child support to be paid by Marvin by reason of his substantially greater earnings and earning capacity. The provision requiring maintenance of life insurance makes sense here; the amount is within a reasonable range in view of the parties' financial condition and the children's potential needs.

Marvin also requests in his brief that he be allowed to designate as beneficiary of the insurance policy a trustee who would eventually apply the proceeds of the policy for the benefit of the children. Marvin gives no persuasive reason why a trust would here better serve the interests of the children. The request that a trustee be substituted as beneficiary of the life insurance policy is denied.

B. Personal Property. Marvin makes several different arguments to support his contention that the distribution of personal property between the parties was unfair. We find no merit in these contentions.

First, Marvin argues that a list of personal property, labeled petitioner's Exhibit "9", represented an agreement between the parties which the trial court should have enforced. He argues that among the factors the trial court is statutorily required to consider is "any written agreement made by the parties concerning property distribution." Iowa Code § 598.-21(1)(k) (1983). That code section is not here controlling because the evidence does not establish that Exhibit "9" was such an agreement. The evidence shows rather that Exhibit "9" is simply a list of items prepared by Marvin but never finally agreed upon by Betsy.

Second, Marvin asks that he be decreed to be the owner of several items that were in his possession at the time of trial but were awarded to Betsy. He claims that several of these items were gifts made to him by other persons. We review the record de novo and find little evidence on the matter, certainly insufficient evidence to substantiate Marvin's contentions. Although Exhibit "9" identifies certain items of property as "gifts", there is nothing to indicate that the items were given solely to Marvin.

We affirm the trial court's distribution of personal property owned by the parties.

V. *Trial Court's Failure to Retain Jurisdiction.*

Because he was worried about Betsy's threats to remove the children from Iowa, Marvin asked the trial court to retain jurisdiction indefinitely in order that custody of the children could more readily be shifted to him if she moved. He now appeals the trial court's refusal of that request, arguing that the children need the stability of their present Des Moines neighborhood and school district.

We agree that stability is very important in the lives of young children, but stability can be nurtured as much by leaving them with the same custodial parent as by requiring that they live in the same neighborhood. The heavy burden upon a party seeking to modify custody stems from the principle that once custody of the children has been fixed it should be disturbed only for the most cogent reasons. *In Re Marraige of Frederici,* 338 N.W.2d 156, 160 (Iowa 1983); *In Re Marriage of Mikelson,* 299 N.W.2d 670, 671 (Iowa 1980). We have repeatedly stressed that the question of child custody should be settled once and thereafter little disturbed. *In Re Marriage of Melton,* 256 N.W.2d 200, 205 (Iowa 1977).

Our cases generally hold that removal of children from the state, in our highly mobile society and for good economic

reasons, provides no justification in itself for a custodial change. *In Re Marriage of Day,* 314 N.W.2d 416, 420 (Iowa 1982); *In Re Marriage of Lower,* 269 N.W.2d 822, 826–27 (Iowa 1978). For Marvin, the only adverse effect of the trial court's refusal to retain jurisdiction is that if he hereafter seeks modification of the custodial provisions of the decree he will have the usual burden of proof to show (1) substantial change of circumstances and (2) conditions making it essential and in the children's best interest that custody be changed. *In Re Marriage of Frederici,* 338 N.W.2d at 158; *In Re Marriage of Hobson,* 248 N.W.2d 137, 139–40 (Iowa 1976). This case is not so exceptional as to warrant a departure from our general rule, frequently applied, that trial courts should make final disposition of dissolution cases on the circumstances then existing. *See, e.g., In Re Marriage of Schlenker,* 300 N.W.2d 164, 165–66 (Iowa 1981); *In Re Fenchel,* 268 N.W.2d 207, 209 (Iowa 1978).

The trial court did not err in refusing to retain jurisdiction of the parties.

VI. *Attorney's Fees.*

A. Award by the Trial Court. Marvin contends that the trial court erred in requiring that he pay $1000 of Betsy's attorney's fees. It is true that Marvin presently is saddled with more debt than Betsy and that part of the debt results from child support payments. On the other hand, Betsy correctly notes that Marvin's financial statement discloses income much greater than her own and lists expenditures greater than her own even though she has the children in her physical custody most of the time. We find adequate support in the record for the trial court's determination that Marvin was better able than Betsy to pay those expenses of this dissolution proceeding, as well as the court costs.

B. Attorney's Fees on Appeal. Betsy has filed an application with this court for payment of appellate attorney's fees. Without deciding the fee that her attorney may reasonably charge her, we direct that Marvin be required to pay $1200 of Betsy's attorney's fees on appeal.

AFFIRMED.