**Shawn HODSON, Appellant,**

v.

**David MOORE, Appellee.**

No. 90–677.

Court of Appeals of Iowa.

Nov. 29, 1990.

As Corrected April 15, 1991.

Barry S. Kaplan of Fairall, Fairall, Kaplan, Hoglan, Condon & Klaessy, Marshalltown, for appellant.

William L. Springer, Marshalltown, for appellee.

Heard by OXBERGER, C.J., and DONIELSON and HABHAB, JJ.

OXBERGER, Chief Judge.

Shawn Hodson and David Moore are the parents of a son, Jeremiah, born June 20, 1981. Shawn and David lived together from 1976 until 1982, when Shawn and Jeremiah moved out. Jeremiah was approximately nine months old when the move took place. Jeremiah resided with Shawn until November 4, 1989, when David removed Jeremiah from Shawn's home without her consent. Since that time Jeremiah has resided with David and at least part of the time, also with Barbara Ridgeway, who, David asserts he plans to marry soon.

The parties disagree about the facts surrounding the November 4, 1989, incident leading to Jeremiah's removal from Shawn's home. David contends he attempted to return Jeremiah to Shawn's home after taking him skating at approximately 9:30 p.m. per Shawn's directions and upon not finding Shawn at home he and Jeremiah set out in search of her. He found Shawn and her friend Lori Bartlett drinking beer at a local bar. David claims Shawn took no interest in Jeremiah's whereabouts and was intoxicated, therefore he decided to take Jeremiah home with him after retrieving some personal items for Jeremiah as well as Jeremiah's school picture from Shawn's home. David is not completely clear on how he happened to have a key to gain access to Shawn's home.

Shawn contends she and David had arranged for David to share the entire weekend with Jeremiah and therefore she made plans consistent with that agreement to spend the evening out. She denies she lacked concern for Jeremiah's well-being and states she simply attempted to find out from David what the situation was with respect to Jeremiah. Both parties agree David and Lori engaged in a verbal confrontation over the matter without identifying the significance of the confrontation.

David's main contentions regarding Shawn's inability to appropriately care for her child appear to center around the inappropriateness of Shawn's relationship with Lori and Lori's negative influence on Jeremiah. The record is devoid of any attempts made by David to discuss his concerns with Shawn prior to his rash behavior of removing Jeremiah from her home followed by his attempts to thwart Shawn's visitation with Jeremiah.

Shawn, thirty-four, has been employed as a medical secretary for the last fourteen years, earning $16,800 per year. Shawn acknowledges that she maintains a sexual relationship with Lori Bartlett, her twenty-four-year-old female roommate. Shawn and Lori have lived together since June 1989. Lori has a lengthy history of criminal convictions involving alcohol and was incarcerated for an OWI second offense conviction. Lori acknowledges that she drives even though she does not have a license and characterizes herself as a "social drinker" after describing herself as a recovering alcoholic.

David currently resides with his fiancee Barbara Ridgeway who has been divorced four times. Barbara testified that her parental rights were terminated with respect to her only child when he was approximately ten years old. She describes the situation as occurring because she was residing in another state and she was unable financially to to return to Iowa at the time to defend her rights.

The district court placed Jeremiah in joint legal custody and in David's primary physical care.

Shawn appeals contending she should have primary physical care of Jeremiah. She points to the fact that prior to the nonconsensual removal of Jeremiah from her home she was his primary caretaker during the majority of his life. Further, Shawn requests David be ordered to pay child support of $200 per month if she is awarded primary physical care of Jeremiah. Shawn asserts David provided approximately $240 per year toward child support during the first eight years of Jeremiah's life. David contends he provided more financial support than $240 per year but is unable to provide any support for his contention.

The criteria governing custody determinations are the same regardless of whether the parents are dissolving their marriage or have never been married to each other. *Neubauer v. Newcomb*, 423 N.W.2d 26, 26 (Iowa App.1988) (citing *Heyer v. Peterson*, 307 N.W.2d 1, 7 (Iowa 1981)). We review this matter de novo. Iowa R.App.P. 4. We give weight to the fact findings of the trial court, especially when considering the credibility of witnesses, but are not bound by them. Iowa R.App.P. 14(f)(7).

In child custody cases, the best interest of the child is the first and governing consideration. The factors to consider in awarding custody are enumerated in Iowa Code section 598.41(3) and in *In re Marriage of Weidner*, 338 N.W.2d 351, 356 (Iowa 1983) and *In re Marriage of Winter*, 223 N.W.2d 165, 166–67 (Iowa 1974). All factors bear on the "first and governing consideration," the court's determination of what will be in the long-term best interest of the child. *In re Marriage of Vrban*, 359 N.W.2d 420, 424 (Iowa 1984). The critical issue in determining the best interest of the child is which parent will do better in raising the child; gender is irrelevant and neither parent should have a greater burden than the other in attempting to gain custody. *In re Marriage of Ullerich*, 367 N.W.2d 297, 299 (Iowa App.1985).

After a thorough evaluation of the record we find Jeremiah's best interests served by providing for joint custody in both of his parents and primary physical custody with Shawn, his mother. We base our opinion upon various factors but find that neither of Jeremiah's parents' situations are beyond our concerns with respect to Jeremiah's future well-being. Although Shawn's homosexual relationship with Lori appears to be of great concern to David and a fair amount of concern to the trial court we are more concerned about other aspects of the parties' situations. Both Shawn and Lori testified they are discreet with respect to their sexual relationship and do not engage in any inappropriate

behavior in Jeremiah's presence. We find nothing to contradict this assertion. Further, we are mindful of the fact that David is also living with a person whom he is not married to at the present time. Further, no testimony was entered about any harm to Jeremiah as a direct result of Shawn's homosexuality per se. Any potential harm appears to relate to Lori's alcoholism and apparent immaturity rather than her sexuality.

Shawn testified that David had physically assaulted her in the past as well as threatening her and damaging her property. David denied ever assaulting Shawn and stated that although he had previously engaged in fighting he no longer did so. We find David's assertions questionable in the face of his 1989 conviction for disorderly conduct for fighting outside a local bar.

David has exhibited a lack of financial responsibility in the past regarding support for Jeremiah and we are not impressed with his sudden generosity by providing Jeremiah with clothes, a Nintendo game and a computer. Shawn appears to have always maintained insurance and the other necessities for Jeremiah as well as saving for Jeremiah's future needs through her employment and we commend her for her efforts.

Jeremiah's school teacher testified that due to behavioral problems, he requires a structured disciplinary scheme which provides definite and foreseeable punishments. Shawn appears to be better able to provide such a scheme on a regular basis. Jeremiah's teacher testified that she felt Shawn was very supportive of Jeremiah's behavioral needs and tried to follow through with directives provided by her, whereas she testified she felt David tried to be supportive without further elaboration.

Additionally, based upon the parties' previous relationship, Shawn appears to be more cooperative with respect to visitation than David. Shawn was forced to go to court to get a temporary visitation order following Jeremiah's move to David's home whereas she had previously worked within an informal structure with David without problems. David's only concerns involving his visitation appeared to stem from his failure to schedule visits in advance. Further, Shawn testified problems arose when David told Jeremiah he was coming for a visit and then would not show up.

Consequently, after evaluating the record we reverse the trial court's decision and place Jeremiah in the parties' joint legal custody and Shawn's primary physical custody. We order visitation with David every other weekend starting at 9:00 a.m. Saturday and continuing until 8:00 p.m. the following Sunday. David shall be responsible for picking Jeremiah up and returning him to Shawn's home. This visitation schedule is certainly not meant to limit any additional visitation agreed upon by the parties. Both parents are urged to cooperate in providing Jeremiah with frequent contacts with both of his parents.

It is well established that parents have a legal obligation to support their children. *In re Marriage of Fleener*, 247 N.W.2d 219, 221 (Iowa 1976). The obligation to support should be apportioned according to the ability of each parent to contribute. *In re Marriage of Bornstein*, 359 N.W.2d 500, 504 (Iowa App.1984). Since we have placed Jeremiah in Shawn's primary physical care and relying on the Child Support Guidelines established by the supreme court we order David to pay $72.00 per month toward Jeremiah's support until such time as Jeremiah reaches his eighteenth birthday. Payments shall be made to the clerk of the district court of Marshall County.

In conclusion, we caution Shawn that although we find her best able to minister to Jeremiah's needs we have deep concerns about the wisdom of sharing her family home with a recovering alcoholic that characterizes herself as a social drinker and who appears to lack maturity as well as respect for the governing laws. While we do not find a discreet homosexual relationship to be a per se bar against a mother's custody, we do find the behavior of those

sharing a custodial parent's home an important factor in continuing that custody and if that behavior can be found to harm the child, the child's interests would require either curtailment of the harmful situation or a change of custody.

REVERSED.