**IN THE COURT OF APPEALS OF IOWA**

No. 21-1447
Filed May 25, 2022


**ALEX LEE NOECKER,**
     Plaintiff-Appellant,

**vs.**

**MCKAYLA MAYSHELL CLOYD-HIRZ,**
     Defendant-Appellee.
_____


Appeal from the Iowa District Court for Pottawattamie County, Kathleen

Kilnoski, Judge.


A father appeals a custody modification.    **AFFIRMED IN PART,**

**REVERSED IN PART, AND MODIFIED.**


J. Joseph Narmi, Council Bluffs, for appellant.

Kyle E. Focht of Focht Law Office, Council Bluffs, for appellee.


Considered by Vaitheswaran, P.J., and Tabor and Badding, JJ.

**TABOR, Judge.**

Alex Noecker appeals a modification order granting sole legal custody of his nine-year-old daughter, I.C.-N., to her mother McKayla Cloyd-Hirz. He also appeals the award of trial attorney fees. Because I.C.-N.'s safety and mental health are best served by the modified custody order, we affirm. But we reverse the portion of the order delegating discretion over visitation to McKayla and modify to deny visitation to Alex. And finding no abuse of discretion, we decline to disturb the fee award. Finally, we deny McKayla's request for appellate attorney fees.

## I. Facts and Prior Proceedings

Alex and McKayla never married but have a daughter in common. I.C.-N. was born in 2012. The following year, Alex and McKayla agreed to joint legal custody with McKayla having physical care and Alex exercising visitation. For a few years, that arrangement worked well. In fact, in 2017 Alex and McKayla agreed to increase Alex's visitation.

But McKayla noticed a decline in the quality of Alex's parenting after he underwent heart surgery in 2018. I.C.-N. told her mother that when she stayed with her father there was not enough food at his house and loud music kept her awake. And the parents' relationship grew hostile; Alex would often disrespect McKayla and call her names.

The conflict worsened during a weekend visitation. Deven—the mother of I.C.-N.'s half-sister B.N.—received worrying late-night Snapchat messages. In response, Deven and McKayla went to Alex's house where their daughters were spending the night. There, Alex and his girlfriend Melissa were drinking and arguing. After the mothers let themselves in, Melissa wrestled Deven to the floor.

The commotion woke I.C.-N. and B.N. Upset, I.C.-N. begged Alex: "Dad, if you love me make it stop, make it stop." But Alex did not intervene.

More generally, McKayla worried that Alex no longer treated I.C.-N. with love. After being at her father's home, I.C.-N. exhibited "erratic mood swings." Unprompted, I.C.-N. reached out to her elementary school counselor. But even with that guidance, a despondent I.C.-N. told her first-grade classmate that she wanted to run away. When McKayla informed Alex about their daughter's plan, he lashed back at McKayla "like it wasn't a big deal."

And things just got worse. During an April 2019 visitation, I.C.-N. found Alex passed out on his kitchen floor. Child protective services reported that excessive alcohol consumption caused Alex's condition. But during the modification hearing, Alex suggested that his prescription medication may have also played a role. Whatever the cause, the incident led to I.C.-N. being adjudicated as a child in need of assistance (CINA).[1] And her visits with Alex ended.

By June 2019, I.C.-N. began seeing therapist Debra Tuttle. The provider diagnosed her with acute stress response, a precursor to post-traumatic stress disorder (PTSD). I.C.-N. shared "that she did not feel safe with [Alex] . . . [and] she was afraid to be around him because of his alcohol use and intoxication." According to McKayla, these fears manifested as nightmares, intrusive thoughts, mood swings, and temper tantrums.

---

[1] In the CINA proceedings, Alex was ordered to complete mental-health and substance-abuse evaluations and submit to drug testing. But as Alex conceded during the modification hearing, he was "defiant" and "sometimes resist[ed]" these requirements.

With weekly treatment, I.C.-N.'s mental health improved. But in October 2019, Alex participated in a therapy session with his daughter. According to Tuttle, I.C.-N. "became very stiff and rigid" when he entered the room. Soon, Alex "sounded like he was cross-examining" his daughter. In Tuttle's opinion, Alex was "focused primarily" on proving the girl wrong rather than on reunification. According to Tuttle, I.C.-N. backslid "quite a bit" after that session.

That regression in mind, in January 2020, McKayla petitioned for sole custody and supervised visitation. While the petition was pending, Tuttle tried another therapy session with I.C.-N. and Alex together. But again, I.C.-N.'s mental health took a turn for the worse. Nightmares and emotional outbursts returned after months of reprieve. The situation became so severe that I.C.-N. renewed weekly sessions with Tuttle.[2] And Tuttle changed her diagnosis from acute stress response to PTSD.

In a December 2020 letter to the district court, Tuttle described the enduring rift between I.C.-N. and Alex:

> Seeing her father again, even in a very controlled environment, will be further detrimental to [I.C.-N.'s] mental health at this time. I am unsure when or if it will be possible for [I.C.-N.] and her father to reunite successfully. Her father continues to be extremely rigid and believes [I.C.-N.] should be punished for "lying" after more than a year has passed.

In June 2021, the district court held a modification hearing. The court granted McKayla's request for legal custody and physical care of I.C.-N. Any

---

[2] Before the second session with her father, I.C.-N. had been coping well without therapy for about six months.

contact between I.C.-N. and Alex was at McKayla's discretion. The court also awarded McKayla $1500 in attorney fees. Alex appeals the modification ruling.[3]

## II. Scope and Standards of Review

Our review is de novo. *Mason v. Hall*, 419 N.W.2d 367, 369 (Iowa 1988). We examine the whole record and adjudicate rights anew on the issues properly raised by the parties. *Nicolou v. Clements*, 516 N.W.2d 905, 906 (Iowa Ct. App. 1994). We give weight to the district court's fact findings, especially when considering witness credibility. *Id.* But we are not bound by them. *Id.* Our "controlling consideration" is always the child's best interests. *In re Marriage of Swenka*, 576 N.W.2d 615, 616 (Iowa Ct. App. 1998).

We review an attorney fee award for abuse of discretion. *In re Marriage of Giles*, 338 N.W.2d 544, 546 (Iowa Ct. App. 1983).

## III. Discussion

## A. Modification.

To change a paternity decree's custodial or physical care terms, the petitioner must show "a substantial change in circumstances . . . not contemplated by the court when the decree was entered which was more or less permanent, and relates to the welfare of the child." *Melchiori v. Kooi*, 644 N.W.2d 365, 368 (Iowa Ct. App. 2002). Our state favors joint legal custody. *In re Marriage of Weidner*, 338 N.W.2d 351, 359 (Iowa 1983). But a parent can overcome that preference with "clear and convincing evidence . . . that joint custody is unreasonable and not

---

[3] McKayla's counsel waived the right to file an appellee's brief.

in the best interests of the child." Iowa Code § 598.41(2)(b) (2020). Our best-interests analysis is guided by these statutory factors[4]:

> a. Whether each parent would be a suitable custodian for the child.
> b. Whether the psychological and emotional needs and development of the child will suffer due to lack of active contact with and attention from both parents.
> c. Whether the parents can communicate with each other regarding the child's needs.
> d. Whether both parents have actively cared for the child before and since the separation.
> e. Whether each parent can support the other parent's relationship with the child.
> f. Whether the custody arrangement is in accord with the child's wishes or whether the child has strong opposition, taking into consideration the child's age and maturity.
> g. Whether one or both of the parents agree or are opposed to joint custody.
> h. The geographic proximity of the parents.
> i. Whether the safety of the child, other children, or the other parent will be jeopardized by the awarding of joint custody or by unsupervised or unrestricted visitation.

Iowa Code § 598.41(3). These principles in mind, we turn to the merits.

The district court decided I.C.-N.'s mental-health diagnosis was a substantial change in circumstances since the decree. Alex does not directly contest that finding. So we consider that step unchallenged.

Turning to the question of sole custody, the statutory factors support severing Alex's legal custodial relationship with I.C.-N. We could begin and end with the first factor. Alex is not a suitable custodian for the child. *See* Iowa Code § 598.41(3)(a). As the district court found, he has "not shown an ability to put the child's needs before his own." His alcohol and drug use, as well as his harsh parenting style have caused I.C.-N. fear and alienation.

---

[4] Subsections (j) and (k) are not relevant here.

Considering the other factors reinforces that view. I.C.-N. will not suffer psychologically or emotionally from a lack of contact with Alex. In fact, the opposite is true. Contact with him "exacerbates her mental health symptoms." He has not had visitation with her for three years. And he has not been able to communicate effectively with McKayla about their daughter's needs. As for the child's wishes, according to the guardian ad litem (GAL) from her CINA case (who testified at the modification hearing), I.C.-N. would "like to just be in the custody of her mom, not have to see her dad, and be able to go on with her life." Is she old enough or mature enough to have a say? We defer to the GAL's assessment that I.C.-N. is "smart," "has great insight into the situation that's going on around her," and is "not your average nine-year-old."

But Alex insists he is a "loving and stable father" and asks that we restore joint legal custody and visitation, reversing the district court's "de facto termination" order. As Alex sees it, "the crux of the rub" is I.C.-N.'s therapist. He argues Tuttle is "unqualified, prejudiced, subjective, and easily influenced." And he contends that, because the district court relied on Tuttle's testimony, it failed to act in I.C.-N.'s best interests.

Trouble is, the district court made clear credibility assessments. The court found the therapist to be "professional, patient, skilled, and implacable."[5] Given our distance from the witnesses on appeal, we defer to the court's assessment. *Nicolou*, 516 N.W.2d at 906. That said, even without the explicit credibility finding,

---

[5] In contrast, the district court expressed skepticism over Alex's testimony, noting his theory about the child's mental health "simply makes no sense."

we agree with the district court that there is ample evidence that joint custody is not in the child's best interests. *See* Iowa Code § 598.41(2)(b).

I.C.-N. has long reported distress from her father's substandard care. Yet Alex has been reluctant to confront the roots of his daughter's anxiety. Indeed, Tuttle was concerned that Alex "complete[ly] disconnect[ed] emotionally from his daughter" during their therapy sessions. As further evidence of Alex's callous attitude, McKayla offered into evidence a January 2019 Snapchat video of I.C.-N. crying and asking for her mother.[6] Alex posted the video with a dismissive caption and a smiling emoji. When asked about this video, Alex testified: "[I]f you think that you're gonna run the show . . . that's not how the world works, you don't get to choose your father."

But despite the foregoing, Alex believes it is in I.C.-N's best interest "to overturn the district court's ruling and grant visitation." He points to his relationship with B.N. as reflecting his capable parenting.[7] And he urges that he "is willing to do whatever" it takes and would accept visitation in whatever form is best for I.C.-N. To that end, he suggests starting therapy sessions with a new provider.

---

[6] I.C.-N.'s toddler sister B.N. can be seen trying to console her older sister. Meanwhile, Alex keeps recording, unshaken by his distraught daughter.

[7] True, Alex's relationship with B.N. appears to be healthier. But this does not change his relationship with I.C.-N.

What's more, the GAL explained the difference between the sisters. Based on her observations, the GAL believed that B.N. was too young to process the experiences that traumatized I.C.-N. Beyond that, the GAL believed that Alex harbored resentment toward I.C.-N. because she "made the phone call" that led to the CINA adjudication. Finally, the GAL noted that the relationship between Alex and the respective mothers was different, with Alex getting along better with Deven than McKayla.

Given Alex's track record of hostility toward providers and I.C.-N.'s visceral reaction to therapy with her father, we doubt a new therapist would achieve a different outcome. *See In re A.B.*, 815 N.W.2d 764, 778 (Iowa 2012) (looking at "past performance" to predict future action). As the district court noted, Alex "offer[s] no plan that accept[s] I.C.-N. as she is now."

We recognize that "the right of access to one's child should not be denied unless the court is convinced such visitations are detrimental to the best interest of the child. In the absence of extraordinary circumstances, a parent should not be denied the right of visitation." *Smith v. Smith*, 142 N.W.2d 421, 425 (Iowa 1966); *see also Thompson v. Fowler*, No. 17-0284, 2017 WL 6513973, at *3 (Iowa Ct. App. Dec. 20, 2017) (remanding case when court delegated discretion over visitation to opposing party). But like the district court, we are convinced that visitation with Alex would be detrimental at this point in I.C.-N.'s emotional development, as demonstrated by the 2019 and 2020 therapy sessions. That said, the court's delegation of discretion over visitation to McKayla was improper. *See Thompson*, 2017 WL 6513973, at *3; *accord In re Marriage of Retterath*, No. 14-1701, 2015 WL 6509105, at *4 (Iowa Ct. App. Oct. 28, 2015). Instead, this is the rare case that requires the court to deny visitation because contact with Alex will likely cause significant emotional harm to the child. *See Smith*, 142 N.W.2d at 425; *see also* Iowa Code § 598.41(1)(a).

Still, we emphasize that a future relationship between Alex and I.C.-N. should not be off the table. We are encouraged by McKayla keeping a close connection with I.C.-N.'s paternal grandparents. And we applaud her assertion that she is "absolutely" open to having Alex rebuild a relationship with their

daughter after I.C.-N. has "healed as an individual." Right now, visitation may not be what I.C.-N. "wants or what she needs." Someday, it may be in I.C.-N's best interests to resume visitation with her father.[8] But only the district court may modify the decree—after the parties have had the chance to be heard. *See In re Marriage of Stephens*, 810 N.W.2d 523, 531 (Iowa Ct. App. 2012).

McKayla proved modification was in I.C.-N.'s best interests. We affirm the grant of sole legal custody to McKayla but reverse the delegation provision and modify to deny Alex visitation.

### B. Attorney Fees

Next we consider attorney fees. Alex challenges the district court's grant of $1500 to defray McKayla's legal expenses, arguing it was an abuse of discretion. And McKayla requests $700 to cover appellate attorney fees.

Trial first, attorney fee awards are within the district court's discretion. *Giles*, 338 N.W.2d at 546. Any fees granted should be in reasonable amounts and based on the parties' respective abilities to pay. *In re Marriage of Van Ryswyk*, 492 N.W.2d 728, 732 (Iowa Ct. App. 1992). McKayla prevailed on the merits, received a comparatively small fee award, and earns half what Alex does. We cannot say the district court abused its discretion. So we affirm that award.

As for appellate attorney fee awards, we grant them at our discretion. *Id.* We consider the parties' respective abilities to pay and whether the requesting party had to defend the district court's decision. *Id.* McKayla's attorney waived

---

[8] Future restrictions on visitation would be less likely if Alex could show "definite evidence of improved self-control and thinking" on his part. *See Smith*, 142 N.W.2d at 423.

the opportunity to file a brief.  So we decline to award fees.  Costs of the appeal are assessed to Alex.

**AFFIRMED IN PART, REVERSED IN PART, AND MODIFIED.**