# IN THE COURT OF APPEALS OF IOWA

No. 24-0779
Filed December 18, 2024

**JACOB EMORY TRIPP,**
        Petitioner-Appellant,

**vs.**

**MALLORY ANNE JENSEN,**
        Respondent-Appellee.
_____

Appeal from the Iowa District Court for Cerro Gordo County, Rustin Davenport, Judge.

Jacob Tripp appeals the physical care provisions of the district court's custody decree. **AFFIRMED.**

Jesse Marzen of Marzen Law Office, P.L.L.C., Waverly, for appellant.

William P. Baresel of Walk, Prichard, Baresel & Murphy, PC, Charles City, for appellee.

Considered by Tabor, C.J., and Chicchelly and Sandy, JJ.

**SANDY, Judge.**

"Unfortunately, child custody disputes are often hotly-contested, bitter affairs in which the innocent children in issue suffer as confused and unwilling pawns." *In re Custody of Peal*, 290 S.E.2d 664, 645 (N.C. 1982). This case is no exception.

Jacob Tripp appeals the district court's custody decree granting Mallory Jensen physical care of their minor son. Tripp contends the district court erred in its physical care determination, arguing it is not in the child's best interests for Jensen to have physical care.

Upon our de novo review of the record, we affirm.

## I.    Background Facts and Proceedings

Tripp and Jensen first met in 2015, a time during which both were struggling with substance-use issues. They both eventually achieved sobriety and have commendably maintained sobriety for a number of years. In 2018, they began what Jensen described as a "rocky" romantic relationship. A year later, Jensen and her minor son from a previous relationship—E.J.—moved into a house in Mason City with Tripp. Tripp and Jensen were never married.

Shortly after moving in with Tripp, Jensen began to have doubts about the long-term outlook of their relationship. According to Jensen, her doubts were fueled by the fact that Tripp and E.J. weren't getting along well. E.J. has several significant behavioral and developmental issues that cause him to act aggressively and violently towards others.[1] In Jensen's words, the early days of living with Tripp

---

[1] Due to E.J.'s behavioral and developmental issues, Jensen consented to her parents obtaining a guardianship of him.

involved "a lot of me having to intervene between Jacob and [E.J.] because [Tripp] would yell at him or try to physically discipline him, and I would have to be the buffer in between the two of them." The record discloses that Tripp once spanked E.J. to the point of leaving a "raised hand welt" on his back. This led to a confirmed child abuse report. Tripp denies causing the mark on the child's back, instead suggesting the welt was caused by E.J. falling on a toy. Jensen's initial plan was to move out of the house once the lease ended.

But Jensen's plans to move out were upended when she and Tripp conceived a son. Their son C.T.—the child at issue in this appeal—was born in the summer of 2020. After C.T.'s birth, Jensen decided to continue living with Tripp. However, their relationship did not improve. Jensen grew frustrated that she performed the majority of caretaking duties for C.T. During the time she lived with Tripp, Jensen worked part time, cared for the children, and attended nursing school. Tripp was employed and worked during the day. In Jensen's words, "I did all the cleaning. I did all the cooking. I did some of the lawn mowing, never the snow blowing. He did occasionally help fold laundry."

Tripp has a different recollection of the division of labor. In his view, he and Jensen split caretaking duties relatively equally. According to him, with "[c]ooking we took turns; but there was not a whole lot of cooking in the house. It was normally ordering out. Dishes, we took turns washing dishes, doing dishes. Doing laundry, Mallory did most of the laundry; but folding laundry, I helped with that." But a friend—who lived with Tripp and Jensen from early 2020 to June 2021—

confirmed that Jensen was C.T.'s primary caretaker.[2]  As he put it, "Mallory, she worked hard.  She was going to school.  She took care of the kids.  She made dinner.  She did all the—pretty much everything."

Jensen moved out in November 2021.  She then moved in with her parents, taking E.J. and C.T. with her.  Jensen explained that she moved out: "I was trying to go to school, I was trying to take care of an emotionally unstable child, and I was trying to take care of a home."  She added, "[a]nd you know, I'd had several conversations with Jacob that if things didn't improve, that I was going to have to move in with my parents."  Jensen maintains she primarily lived with her parents until her relationship with Tripp ended in May 2023.  However, she admitted that she often stayed two nights per week at the home in Mason City with Tripp even after she moved out.  She also admitted to keeping furniture and some of her personal belongings at the home in Mason City.  While Jensen lived with her parents, Tripp would often visit C.T. on weekends.

Although Tripp and Jensen lived apart for nearly two years, their relationship did not end until May 2023.  On May 5, Tripp was under the impression he was going to attend a family counseling session with Jensen and E.J.  Due to E.J.'s behavioral issues, Tripp and Jensen regularly attended family counseling sessions with him. According to Tripp, he showed up at E.J.'s counseling center, but Jensen and E.J. weren't there.  Tripp called and texted Jensen several times but did not receive a response.  Eventually, Tripp decided to leave the counseling center and

---

[2] Tripp was the friend's Alcoholics Anonymous sponsor and invited him to move into the home.  However, Tripp eventually kicked the friend out of the house after the friend disclosed that he developed feelings for Jensen.

drive back to his house. As he was leaving the parking lot, he saw Jensen driving toward him in her minivan. Tripp pulled over on the side of the road and got out of his vehicle. He then alleged, "[s]o I stopped in the road, got out, and was waiting for her. And when she hit the gas, she never stopped. She hit me and kept on going." Jensen denies hitting Tripp with her vehicle. Instead, she asserted Tripp flung himself into her vehicle.[3]

Regardless of what really happened, the police were called to the scene. After they arrived, they spoke briefly with both parties. No charges were filed following this incident.[4] An Iowa Department of Health and Human Services (HHS) report documenting the incident notes no charges were filed because the police did not find Tripp's allegations believable. After speaking with Tripp and Jensen, the police escorted both to Tripp's home in Mason City. Jensen, with the police supervising, grabbed her remaining personal items in the home and left. Both parties agreed that their relationship ended on this day.

On May 8, Tripp filed a petition for custody, visitation, and child support. In his petition, Tripp requested that he be granted sole legal custody and physical care of C.T. In her answer, Jensen requested she be granted sole legal custody and physical care of C.T. The district court subsequently entered a temporary order addressing custody. In its order, the district court provided the parties would have joint legal custody and joint physical care of C.T. The parties were given the option to create their own schedule for exercising physical care. But in the event

---

[3] The record reveals C.T. was in Jensen's vehicle when it struck Tripp.
[4] After this incident, Jensen filed a petition for relief from domestic abuse. This petition was later dismissed.

the parties could not come to an agreement, Tripp and Jensen were to rotate physical care on a weekly basis.

Prior to the custody trial, Tripp and Jensen utilized the parenting schedule set by the district court in its temporary order. The record indicates C.T. did well under the care of both parties. When C.T. was in Tripp's care, Tripp would frequently involve C.T. in activities he organized within the substance-use-recovery community. Tripp is very active within this community and takes his sobriety seriously. He frequently organizes events such as cookouts. These events provided excellent opportunities for C.T. to socialize because other children would often be present. The record reveals Tripp does an excellent job of meeting C.T.'s basic needs and that the two have a close bond.

The record also demonstrates Jensen is a good mother to C.T. As even Tripp admits, Jensen is capable of providing for C.T.'s needs. Jensen is currently working full-time as a registered nurse. In July 2023, Jensen moved out of her parents' house and into a home in Mason City. Around this same time, Jensen began a relationship with Paul Gonzalez. Gonzalez subsequently moved in with Jensen in September 2023. They are currently dating and are expecting a child together. Jensen's relationship with Gonzalez has caused friction in her coparenting relationship with Tripp. But the record indicates C.T. has a close bond with Jensen and Gonzalez.

While C.T. was well cared for under the temporary physical care arrangement, drama was not lacking between Tripp and Jensen. Tripp alleges that when C.T. returns from Jensen's care that he is "not his normal self." Tripp added C.T. has "a big behavioral problem when he comes back." Tripp also

introduced several audio and video recordings into evidence at the custody trial, which indicate C.T. is unhappy living with Jensen and Gonzalez.  In one clip, C.T. is heard saying Gonzalez "fights with me and my mom."  In a later audio recording, C.T. says to Tripp that Gonzalez "is being naughty" because "he's in trouble."  Additionally, Tripp alleges that Gonzalez has been aggressive with him during child drop offs.  Gonzalez denies ever becoming aggressive with Tripp.

Jensen also reports behavioral problems with C.T. after he returns from Tripp's care.  She alleges C.T. frequently says concerning things when he returns to her house.  As she put it, C.T. will often say:

> That Daddy tells him to be naughty at Mommy's house or he'll get in trouble.  Most recently he told [his therapist] that he was supposed to start biting at our house.  He has told him that Mommy's a bad mommy.  [C.T.] has recently said that his dad told him that he's taking him to a school far away.

Jensen's allegations on this issue were confirmed by her and C.T.'s therapist— Steve Kaduce.  Kaduce has been seeing C.T. and Jensen for family therapy for roughly a year and a half.  According to Kaduce, C.T. would often say negative things about Jensen during therapy sessions.  He would also hit her.  Kaduce added:

> We would talk in therapy about [C.T.] hitting his mother when he came back from visits with his father.  And there would a two-, three-day period where he would say mean things to his mother and hit her; and then we would talk about it in session, [C.T.] say, "My Mommy is bad" and that "Daddy would like to me say bad things about my mom" and that "her boyfriend, Paul is a bad man" and that "Paul threw my daddy down and stomped on his head" and that "someday my daddy's going to get custody of me, and just my daddy and I are going to live together.  We don't have to see Mommy anymore."

Kaduce testified that during numerous sessions C.T. would hit and say mean things to Jensen. However, a few minutes later, C.T. would be very affectionate toward her. Additionally, Kaduce testified C.T. admitted he does not like being caught in the middle of Tripp's and Jensen's fighting. C.T. also told Kaduce that he does not like hearing Tripp say negative things about Jensen. Additionally, C.T. told Kaduce that Tripp encourages him to say negative things about Gonzalez. In Kaduce's opinion, Tripp was coaching C.T. to misbehave when he was in Jensen's care.

Additionally, Jensen introduced into evidence several audio recordings of phone conversations between she and Tripp. During one phone call, C.T. can be heard in the background asking Jensen if she wants to live with Tripp. Jensen responded that she did not. Tripp then proceeded to say—in front of C.T.—that the reason Jensen does not live with them is because she no longer loves him and instead loves Gonzalez. Jensen immediately asked Tripp to stop saying these things because C.T. could hear their conversation.

The district court held a two-day custody trial in January 2024. As the district court thoroughly explained in its custody decree, it determined that Tripp and Jensen would have joint legal custody of C.T. As for physical care, the district court expressed reservations about granting it to either party. As the district court put it, "[b]oth parties also come with notable downsides to choosing them for primary placement." However, the district court granted Jensen physical care of C.T. because it found she had historically performed the primary caretaker functions and was more capable of fostering a positive relationship between the child and the other parent.

Tripp now appeals.

## II. Standard of Review

Our standard of review in child custody matters is de novo. *In re Marriage of Forbes*, 570 N.W.2d 757, 759 (Iowa 1997). "We give weight to the findings of the trial court, which had an opportunity to view the demeanor of the witnesses when testifying." *Id.* But we are not bound by the district court's findings. *In re Marriage of Will*, 489 N.W.2d 394, 397 (Iowa 1992).

## III. Analysis

When making physical care determinations, our primary concern is the best interests of the child. *In re Marriage of Weidner*, 338 N.W.2d 351, 355 (Iowa 1983). "The objective of a physical care determination is to place the child[] in the environment most likely to bring them to health, both physically and mentally, and to social maturity." *In re Marriage of Hansen*, 733 N.W.2d 683, 695 (Iowa 2007). Because the parents never married, this action is governed by Iowa Code chapter 600B (2023). However, when determining custody and physical care, we still consider the nonexclusive factors set forth in section 598.41(3) to determine the physical care arrangement that will be in the best interests of the child. *See* Iowa Code § 600B.40(2); *Hensch v. Mysak*, 902 N.W.2d 822, 825 (Iowa Ct. App. 2017). When joint physical care is not appropriate, "the factors of continuity, stability, and approximation are entitled to considerable weight." *Hansen*, 733 N.W.2d at 700.

With these principles in my mind, we turn to Tripp's argument on appeal. Tripp contends the district court erred in determining it was in C.T.'s best interests to grant Jensen physical care. He asserts the evidence demonstrates he can offer

C.T. more stability because he lives in the "same home the child has always known." Additionally, he points out that he has worked with the same employer for a significant period of time. He argues Jensen cannot offer C.T. the stability he needs to flourish because she moved out of the child's initial home and started a new relationship with another man. He also asserts the district court improperly relied on the fact that Jensen was historically the primary caretaker in reaching its determination. He contends Jensen was only the primary caretaker because of her lack of employment when C.T. was born. We disagree and find granting Jensen physical care is in the child's best interest.

We start our analysis by acknowledging that Tripp is correct that stability of the child's home environment is an important consideration in determining a physical arrangement. *See In re Marriage of Williams*, 589 N.W.2d 759, 762 (Iowa Ct. App. 1998) (noting minimal changes in a child's physical environment promotes emotional stability). And there is little doubt Tripp can offer a more stable home environment for C.T. He lives in the home the child initially grew up in. Conversely, Jensen has moved several times since her relationship ended with Tripp. However, some of her recent moves were related to her breakup with Tripp. And from the record, it appears she has lived in the same home since July 2023. Thus, we are not convinced this factor counsels against the district court's decision to grant Jensen physical care. *See Willenbring v. Roepcke*, No. 05-1261, 2006 WL 624578, at *3 (Iowa Ct. App. Mar. 15, 2006) (noting the district court did not err by

granting mother physical care because her recent moves were related to her separation from the father).[5]

Tripp is also correct that economic stability is an important consideration in determining a child's best interests. *See In re Marriage of McDermott*, No. 03-1723, 2004 WL 1853927, at *2 (Iowa Ct. App. July 14, 2004) (noting a child's "physical and financial stability are clearly important considerations"). Tripp has a history of greater economic stability because he has maintained employment at the same company since C.T.'s birth. In contrast, Jensen has had far less economic stability. However, this is primarily attributable to the fact she attended nursing school and cared for two children during her relationship with Tripp. Jensen has since graduated from nursing school and is employed full-time as a registered nurse. We find this factor does not cut against the district court's decision to grant Jensen physical care. *See Willenbring*, 2006 WL 624578, at *4 (finding a mother's unstable employment history did not weigh against granting her physical care because she was caring for a sick relative and had plans to go back to school).

Putting aside Tripp's stability arguments, our law has placed a greater emphasis on which party has historically served as the child's primary caretaker. *See Williams*, 589 N.W.2d at 762 ("[O]ur case law places greater importance on the stability of the relationship between the child and the primary caregiver over

---

[5] To the extent Tripp suggests Jensen's relationship with Gonzalez should prevent her from being granted physical care, we reject this argument. There is no evidence in the record demonstrating Jensen's relationship with Gonzalez impairs her ability to care for C.T. *See Willenbring*, 2006 WL 624578, at *3 (noting a mother's relationships did not counsel against granting her physical care because there was no evidence those relationships affected her ability to care for the child).

the physical setting of the child."); *see also In re Marriage of Fennell*, 485 N.W.2d 863, 865 (Iowa Ct. App. 1992) ("[C]onsideration is given in any custody dispute to allowing the children to remain with a parent who has been a primary caretaker so as to enable the children to have continuity in their lives."). The record reflects the role of primary caretaker was filled by Jensen. She served in this role despite working part time and attending nursing school. This factor strongly weighs in favor of the district court's decision to grant Jensen physical care.

Finally, the district court's assessment that Tripp has struggled to foster a positive relationship between C.T. and Jensen is fully supported by the record. C.T. admitted to his therapist that Tripp encourages him to misbehave when he is in Jensen's care. C.T. also told his therapist that Tripp encourages him to say negative things about Jensen and Gonzalez. Additionally, there is evidence in the record establishing that Tripp has inappropriately directed negative remarks at Jensen in front of C.T. In one instance, Tripp essentially blamed Jensen for breaking up their family. These actions by Tripp are inappropriate, especially given C.T.'s age. The fact that Tripp cannot set aside his frustrations with Jensen to promote a healthy relationship between she and C.T. weighs in favor of the district court's decision. *See Widdel v. Kannegieter*, No. 09-0436, 2009 WL 5125774, at *4 (Iowa Ct. Dec. 30, 2009) (finding the district court properly granted physical care to the father because the mother could not put aside her anger toward him, which prevented her from fostering a positive relationship between the child and him).

Accordingly, we find the district court appropriately granted Jensen physical care of the child.

**VI.    Conclusion**

We affirm the decision of the district court, finding it did not err by placing the child in the physical care of his mother.

**AFFIRMED.**